# EXHIBIT B

# CIVILIAN COMPLAINT REVIEW BOARD

**ERIC L. ADAMS, Mayor**          **ARVA RICE, Interim Chair**          **JONATHAN DARCHE, Esq. Executive Director**



# 2020
# NYC PROTESTS

# TABLE OF CONTENTS

AGENCY MISSION ........................................................................................................................... 2

THE BOARD AND AGENCY OPERATIONS ....................................................................................... 3

LETTER FROM THE CHAIR ............................................................................................................... 4

BACKGROUND AND EXECUTIVE SUMMARY .................................................................................. 5

METHODOLOGY AND SCOPE ........................................................................................................ 11

INVESTIGATIVE CHALLENGES ...................................................................................................... 12

PROTESTS WITH THE LARGEST NUMBER OF CCRB COMPLAINTS ........................................... 18

      NYPD PROTEST RESPONSE .............................................................................................. 25

FADO & U ALLEGATIONS RECEIVED BY THE CCRB ................................................................. 27

      USE OF FORCE ALLEGATIONS .......................................................................................... 28

      ABUSE OF AUTHORITY ALLEGATIONS ............................................................................ 32

      DISCOURTESY AND OFFENSIVE LANGUAGE ALLEGATIONS ........................................... 36

      UNTRUTHFUL STATEMENT ALLEGATIONS ...................................................................... 39

COMPLAINT DISPOSITIONS .......................................................................................................... 42

DISCIPLINARY RECOMMENDATIONS ............................................................................................ 45

COMPLAINANT DEMOGRAPHICS .................................................................................................. 50

RECOMMENDATIONS .................................................................................................................... 52

APPENDIX A ................................................................................................................................... 54

APPENDIX B ................................................................................................................................... 60

APPENDIX C ................................................................................................................................... 72

APPENDIX D ................................................................................................................................. 112

APPENDIX E ................................................................................................................................. 129

## AGENCY MISSION

The New York City Civilian Complaint Review Board (CCRB, Board, or the Agency) is an independent Agency that is empowered to receive, investigate, prosecute, mediate, hear, make findings, and recommend action on allegations that a member of the New York City Police Department (NYPD) engaged in excessive or unnecessary Force, Abuse of Authority, including racial profiling and biased-based policing, Discourtesy, or the use of Offensive Language against a member of the public, or that a member of service (MOS) made an untruthful material statement during the course of the resolution of a CCRB complaint. The Board's staff, composed entirely of civilian employees, conducts investigations, mediations, and prosecutions in an impartial manner.

**In fulfillment of its mission, the Board pledges:**

- To encourage members of the community to file complaints when they believe they have been victims of police misconduct;

- To respect the rights of civilians and officers;

- To encourage all parties involved in a complaint to come forward and present evidence;

- To expeditiously investigate each allegation thoroughly and impartially;

- To make fair and objective determinations on the merits of each case;

- To offer civilians and officers the opportunity to mediate their complaints, when appropriate, in order to promote understanding between officers and the communities they serve;

- To recommend disciplinary actions that are measured and appropriate when the investigative findings substantiate that misconduct occurred;

- To engage in community outreach in order to educate the public about the Agency and respond to concerns relevant to the Agency's mandate;

- To report relevant issues and policy matters to the Police Commissioner and the public; and

- To advocate for policy changes related to police oversight, transparency, and accountability that will strengthen public trust and improve police-community relations.

## THE BOARD AND AGENCY OPERATIONS

The CCRB became independent of the NYPD and was established in its current all-civilian form in 1993.The Board consists of 15 members: 5 are appointed by the Mayor; 5 are appointed by The City Council (one from each borough); 3 are designated by the Police Commissioner; 1 is appointed by the Public Advocate; and the Chair is co-appointed by the Mayor and the Speaker of the City Council.

Under the New York City Charter, the Board must reflect the diversity of the City's residents, and all members must live in New York City. No member of the Board may have a law enforcement background, except those designated by the Police Commissioner, who must have had prior experience as law enforcement professionals. No Board member may be a public employee or serve in public office. Board members serve three-year terms, which can be renewed. They receive compensation on a per-session basis, although some Board members choose to serve pro bono.

Board members review and make findings on misconduct complaints once they have been fully investigated. The Board makes one of the following recommendations once it determines that an officer engaged in misconduct: Instructions, Formalized Training, Command Discipline A, Command Discipline B, or Charges and Specifications.

Until 2013, the Board referred all cases of substantiated officer misconduct to the Police Commissioner with a discipline recommendation. Pursuant to a Memorandum of Understanding between the CCRB and the NYPD (effective April 11, 2013), attorneys from the CCRB's Administrative Prosecution Unit (APU) handle the prosecution of most cases in which the Board recommends Charges and Specifications—the most serious discipline recommendation. In all cases, the Police Commissioner has final authority over whether to impose discipline.

## LETTER FROM THE CHAIR



Dear Fellow New Yorkers,

On May 25th, 2020, George Floyd was murdered by a police officer in Minneapolis and the horrifying footage of his death was seen around the world. The response was immediate. Global outrage sparked hundreds of protests across the country and internationally. The Black Lives Matter (BLM) movement, founded in 2013 following the acquittal of Trayvon Martin's killer, George Zimmerman, gained historic momentum and encouraged people to speak out against the systemic racism that plagues the U.S. The streets of New York City flooded with protesters demanding reform.

At the height of these protests, peaceful protesters were kettled, pepper sprayed, assaulted, and arrested. As a result, the CCRB received over 750 complaints, 300 of which were filed in just 48 hours. We began investigating these highly complex cases, all while adjusting to remote work in the middle of the global Coronavirus pandemic. Over the next two years, investigators tracked down witnesses, photographs, video footage, and more to piece together the series of events at protests across all five boroughs. With the evidence diligently collected by CCRB investigators, the Board was able to vote on hundreds of cases and found 146 officers committed misconduct and recommended discipline based on the NYPD's disciplinary Matrix.

This report details the patterns of misconduct discovered in the NYPD protest response, roadblocks the CCRB encountered while investigating these cases, recommendations on how to improve the process moving forward, and the current status of each protest case.

Protests against police brutality bred more instances of police misconduct. If this misconduct goes unaddressed, it will never be reformed.

Sincerely,

Arva Rice

## BACKGROUND AND EXECUTIVE SUMMARY

### BACKGROUND

On May 25, 2020, in Minneapolis, MN, police responded to a call that George Floyd allegedly tried to use a counterfeit twenty-dollar bill at a local convenience store. During the arrest, police officer Derek Chauvin killed Mr. Floyd, an unarmed Black man, by kneeling on Mr. Floyd's neck for more than nine minutes, despite Mr. Floyd's repeated protestations that he could not breathe. Seventeen-year-old Darnella Frazier recorded a video of the incident that was seen across the world.[1]

Mr. Floyd's killing came on the heels of the March 13, 2020, fatal shooting of Breonna Taylor in Louisville, KY, while police were executing a no-knock warrant. Although stay-at-home orders and mask mandates were in place across the country because of the COVID-19 pandemic, Mr. Floyd's murder incited a flurry of sustained protests throughout the United States, drawing thousands of people into the streets to protest the repeated instances of Black people being killed during interactions with the police, widespread law enforcement abuses, and systemic racism.

In New York, large-scale protests began on May 29, 2020, and lasted through early June 2020. From June 1 to June 8, then-Mayor Bill de Blasio imposed city-wide curfews, which prohibited members of the public, with certain exceptions, such as first responders and other essential workers, from being outside during evening and overnight hours. Non-exempt persons who violated the curfew were subject to arrest. Smaller-scale protests continued throughout the summer and into early fall. Although these protests were largely peaceful, from May 2020 to November 2020, the CCRB received hundreds of complaints from civilians, members of the press, and legal observers detailing abusive treatment, interference, and other misconduct by NYPD officers at protest locations.

While members of service were facing unprecedented challenges, the NYPD's response was widely condemned in the press. In the aftermath of the protests, multiple government, civil, and human rights organizations, including Human Rights Watch, the New York State Attorney General's Office, and the New York City Department of Investigation, issued reports[2] that found serious deficiencies in the protest response and made recommendations to improve NYPD's strategy, planning, and training.

This report focuses on individual instances of alleged officer misconduct reported to the CCRB by members of the public.

---

[1] https://www.npr.org/2021/05/26/1000475344/read-this-powerful-statement-from-darnella-frazier-who-filmed-george-floyds-murd
[2] https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf, https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

**CCRB INVESTIGATIONS**

The CCRB received 321 complaints related to the protests that were within its jurisdiction. It was able to conduct a full investigation[3] of 226 of those complaints.

Of the 226 fully investigated complaints reviewed by the Board:

- **88** complaints of misconduct were **Substantiated** (the Board determined by a preponderance of the evidence that misconduct occurred).
- **59** complaints were **Officer Unidentified** (the Board was unable to identify the officers involved in the alleged acts of misconduct).
- **50** complaints were **Unable to Determine** (there was insufficient evidence to determine whether misconduct occurred).
- **18** complaints were **Within NYPD Guidelines** (the officer acted within Departmental Guidelines).
- **11** complaints were **Unfounded** (the Board determined that the misconduct alleged did not occur).

Each complaint may involve multiple allegations against one or more members of service. The Board makes a finding on each allegation of misconduct.

The Board substantiated **269** individual allegations of misconduct against **146**[4] members of service. Those allegations fell into the following categories:

- **140** substantiated allegations were for excessive force, 121 of which involved physical force and/or the improper use of batons and pepper spray.
- **72** substantiated allegations were for abuse of authority, including 31 substantiated allegations that officers refused to provide their name and/or shield number or obstructed their shield number.
- **24** substantiated allegations were for untruthful statements, 22 of which were for false official statements or misleading official statements.
- **24** substantiated allegations were for discourtesy, 20 of which involved the use of discourteous words.
- **9** substantiated allegations were for offensive language, including allegations that officers engaged in hate speech and displays of racism.

---

[3] A complaint is fully investigated when the investigator is able to interview a complainant or alleged victim.
[4] If a MOS has substantiated misconduct in more than one complaint, they will be counted more than once in the total number of MOS with substantiated misconduct.

**BOARD DISCIPLINARY RECOMMENDATIONS AND OUTCOMES**

The Board substantiated protest allegations against **146** members of service. In most cases, the Board relied on the NYPD's Disciplinary Matrix in making the following recommendations to the Police Commissioner:[5]

- Charges and Specifications (administrative prosecution that can result in termination) for **89** officers.
- Command Discipline B (ranges from a reprimand to forfeiture of 10 vacation days) for **26** officers.
- Command Discipline A (ranges from reprimand up to forfeiture of five vacation days) for **31** officers.
- The Board did not recommend Instructions or Training for any substantiated protest allegations.

For the **57** officers who received a Command Discipline A or B recommendation from the Board, the Police Commissioner:

- Imposed command discipline or training against **30** officers (the imposed penalty was less than the CCRB recommended in 4 of those cases).
- Did not to impose any discipline at all against **18** officers.
- Closed the case as officer retired/resigned with no penalty for **3** officers.
- Forwarded the cases for **2** officers who refused Command Discipline to the APU for prosecution.
  - The APU completed 1 administrative trial that is pending Police Commissioner approval.
- Has not made a final disciplinary determination for **4** additional officers.

For the **89** officers for whom the Board recommended Charges and Specifications:

- Administrative proceedings are pending in the APU against **62** officers (each officer is prosecuted separately).
  - The APU entered 2 plea agreements that are awaiting Police Commissioner approval.
  - The APU completed 5 administrative trials that are pending Police Commissioner approval.
- The APU resolved **3** cases by guilty plea.
- The APU entered a plea agreement with **1** officer, but the Police Commissioner rejected the plea and imposed lesser discipline.
- The Police Commissioner retained the cases of **13** officers, which means that the APU cannot prosecute those cases:
  - 2 officers forfeited 10 vacation days.

---

[5] Pursuant to a February 2021 Memorandum of Understanding between the CCRB and the NYPD, the Board agreed to use the NYPD's Disciplinary System Penalty Guidelines, often referred to as the Disciplinary Matrix, to make discipline recommendations. Prior to the implementation of the Disciplinary Matrix, the Board made findings and recommended discipline in 14 substantiated protest complaints.

- o 1 officer forfeited 5 vacation days.
- o 1 officer forfeited 3 vacation days.
- o 9 officers received no discipline at all.
- **4** cases were closed as previously adjudicated with discipline by the NYPD.
- **5** officers retired/resigned before further disciplinary action could be taken.
- **1** case was closed as beyond statute of limitations.

## OBSTACLES TO INVESTIGATING PROTEST COMPLAINTS

The CCRB faced many challenges while investigating protest complaints, including:

- The pervasive and purposeful actions taken by officers to conceal their identities, such as wearing mourning bands over their shields or refusing to provide their name and shield to civilians, and the NYPD's failure to track and document where officers, vehicles, and equipment were deployed, which substantially contributed to **609 (43%)** allegations of misconduct being closed as **Officer Unidentified**.
- Delayed responses, false positives (NYPD turned over footage that was either incorrect or irrelevant in response to a video request), false negatives (the NYPD reported that queries for the requested video footage did not return any results, but the footage was later discovered), and inconsistent responses by the NYPD to requests for footage from body-worn cameras (BWCs) and other NYPD-controlled cameras.
- Officers refusing to be interviewed remotely.
- Delays caused by the remote work and social distancing requirements of the COVID-19 pandemic.

## KEY FINDINGS: MEMBER OF SERVICE CONDUCT

The CCRB's investigations found that during the protests, members of service, from supervision to rank and file officers, engaged in the following actions:

1. Supervisors ordered civilians "kettled"—which is the encirclement of individuals to confine them in a contained area.
2. Officers used batons to strike civilians in violation of NYPD guidelines (**34** substantiated allegations).
3. Officers improperly used pepper spray on civilians in violation of NYPD guidelines, including by deploying pepper spray indiscriminately across crowds of peaceful protesters (**28** substantiated allegations).
4. Officers used physical force, such as pushes and shoves, against civilians in violation of NYPD Guidelines (**59** substantiated allegations).
5. Officers abused their authority against members of the press and civilians who were not involved in protests.
6. Officers failed to provide medical attention to injured civilians (**5** substantiated allegations).
7. Officers were unable to identify other members of service with whom they were deployed and did not know, or could not recall, which superior officer issued orders to take action against protestors.

8. Officers wore mourning bands that obscured their shield numbers and refused to provide civilians with their name and/or shield numbers (**31** substantiated allegations of obstructed shields or refusal to provide name/shield).
9. Officers failed to turn on BWCs during certain interactions with civilians, which is required by the Patrol Guide (**101** other possible misconduct referrals for improper BWC use), or their cameras ran out of battery power.
10. Officers failed to complete required paperwork, including arrest paperwork and reports of injuries to civilians (**48** other possible misconduct referrals for improperly prepared or missing police reports).
11. Officers confiscated property without providing information for retrieval by its owner (**3** substantiated allegations of improper seizure of property).

## KEY FINDINGS: DEPARTMENTAL FAILURES

The CCRB's investigations found that the Department failed in their response to the protests by:

1. Failing to deploy officers in a manner that allowed for the tracking of officer whereabouts and supervising officer assignments.
2. Failing to request adequate EMT support.
3. Failing to delineate commanding officers in the field for lower ranked officers.
4. Failing to ensure that BWCs were functioning.
5. Failing to ensure the completion of standard paperwork, detail rosters, and vehicle assignments.
6. Failing to ensure officers followed proper protocols for arresting, summonsing, and seizing property from protestors.
7. Failing to provide properly labeled specialized equipment utilized during protests ("riot gear") that enables the ready identification of officers.
8. Failing to clarify policies on arresting legal observers.

## RECOMMENDATIONS

1. All members of service should receive updated and routine training on the proper use of crowd control tactics during large-scale events, including the proper use of pepper spray and batons, and the NYPD should keep track of the level of training received by officers.
2. Police should not interfere with legal observers and members of the press who are acting in their official capacities to document protest activity and protect First Amendment rights.
3. Police should not take action against civilians who are complying with police orders to disperse.
4. Officer names and shield numbers should always be clearly visible so that officers are easily identifiable.
5. Officers should be assigned equipment that reflects their name and/or shield numbers. Where that is not possible, an accurate record should be kept of which officers were given each piece of riot gear so that they can be readily identified. Officer names and precinct numbers should be visible in prominent locations on helmets and riot shields.

6. Each precinct should keep a log of which members of service use departmental vehicles and members of service should report what department-issued vehicles they used during their shifts.
7. Superiors should clearly identify themselves to officers at the beginning of shifts and/or before issuing commands.
8. Officers should be given the name of the superiors to whom they will be reporting, if not their regular supervisor, and an accurate record should be kept of temporary supervision assignments.
9. High-ranking members of service (whom do not have shield numbers) should have their names and commands visible in large font on their clothing.
10. The NYPD should log which officers respond to radio calls of other officers in need of assistance.
11. BWCs must be turned on for any officer who places a distress call.
12. Supervisors who take command of public demonstrations must be equipped with BWCs and must turn them on.
13. All department-issued devices with GPS tracking capabilities, such as BWCs, should be activated at the onset of interactions with civilians.
14. The NYPD should include BWC searches on all Internal Affairs Bureau (IAB) referral logs and link digital memo book entries to the appropriate BWC footage (as previously mentioned in the CCRB's BWC report) so that CCRB investigators are provided with this evidence when the case is referred.[6]
15. The CCRB should be authorized to directly access and search NYPD BWC footage. This would significantly improve responsive BWC collection and increase the likelihood of reaching a disposition on the merits.
16. The NYPD should set up designated medical treatment areas with FDNY staff and EMTs on duty so that civilian injuries can be addressed immediately and before they are transported for detainment or arrest processing.
17. Officers should provide property voucher cards whenever they seize property.

## NEXT STEPS

To maintain public confidence in the police department and help prevent the widespread police abuses that occurred during the 2020 protests from being repeated, officers who engaged in substantiated acts of misconduct during the protests must be disciplined pursuant to the NYPD's Disciplinary Matrix and held to account for their actions—particularly those who used excessive force against civilians. It is also imperative that the departmental failures highlighted in this report, primarily the equipment failures and the lack of documentation of officer deployments and assignments, be addressed going forward.

In light of the recommendations in this report, and the other reports issued about the 2020 protests, the NYPD should conduct an assessment of how it utilizes various tactics and tools during protests to properly balance the risks to people and property against the risks of suppressing legitimate and peaceful protest.

---

[6] https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20200227_BWCReport.pdf

## Methodology And Scope

This report (1) discusses challenges that the CCRB encountered while investigating complaints (2) analyzes all the complaints received wherein a complainant/victim stated that they were either engaging in protest activity or witnessed activity occurring at a protest location during the period of May 2020 through November 2020; (3) outlines the type of police misconduct that was reported; and (4) details the discipline recommended by the Board for substantiated allegations of misconduct. Data analyzed is from the 321 complaints that were within the CCRB's jurisdiction and pertains to 500 identified members of service. The CCRB data used in this report was collected on January 24, 2023.

Several data sources were collected and analyzed:

- The CCRB data analysts queried CCRB's internal database for all data relating to protest complaints and compared them to overall CCRB complaints.[7]
- CCRB data analysts read and coded protest complaints to quantify issues identified by investigators.
- CCRB investigators identified common threads across protest investigations.

This report focuses on individual instances of alleged officer misconduct reported to the CCRB by members of the public as the New York City Department of Investigations (DOI) and the New York State Attorney General (AG) have already released reports[8] analyzing the NYPD protest response from an institutional and operational standpoint and how the policing response was impacted by the weeklong curfew.

---

[7] In the comparative analysis, the overall 2020 CCRB complaints exclude the protest complaints. We note that in 2020 the CCRB received less complaints than in previous years, which was likely due to the pandemic.
[8] https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.1 8.2020.pdf, https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

## INVESTIGATIVE CHALLENGES

The CCRB faced several challenges investigating protest-related complaints, many of which led to complaints being closed as "Officer Unidentified" because the CCRB could not determine which officers were involved in the alleged misconduct. Chief among these challenges were: (1) the actions NYPD members took to conceal their identities, which prevented them from being identified by complainants, victims, and witnesses; (2) the NYPD's failure to track and document where officers, vehicles, and equipment were deployed; (3) the NYPD's failure to provide dispositive responses to requests for footage from BWCs and other NYPD-controlled cameras that resulted in delayed responses, false positives, false negatives, and inconsistent responses; and (4) investigative delays resulting from officers refusing to be interviewed remotely. Despite these challenges, CCRB investigators pursued every available avenue to obtain evidence and identify as many officers as possible.

### Challenge One: Concealment of Officer Identities

Of the 226 fully investigated complaints, 59 were closed as "Officer Unidentified." The Board was unable to identify the officers involved in a staggering 43% (609) of fully investigated allegations of protest-related misconduct[9]. As shown in Figure 2, that is almost four times the percentage of subject officers who could not be identified in non-protest complaints (11%).

Although identification of officers is generally more difficult during large scale events, like protests, and the use of masks as an appropriate safety measure to reduce virus transmission due to the COVID-19 pandemic added an additional layer of difficulty to the officer identification process, the CCRB found that purposeful actions by officers, such as obscuring their badges or refusing to provide civilians with their names and shield numbers, resulted in multiple members of service being unidentified, allowing them to escape accountability for their actions during the protests. This concealment occurred with such frequency that "obscuring shield" was given a dedicated misconduct allegation category when the Agency categorized the Abuse of Authority protest allegations.

*Figure 1: Complaints Closed As "Officer Unidentified"*

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| Officer(s) Unidentified | 143 (10%) | 59 (26%) |

*Figure 2: Fully Investigated Allegations Closed As "Officer Unidentified"*

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| Officer(s) Unidentified | 891 (11%) | 609 (43%) |

---

[9] The 609 allegations closed Officer Unidentified do not come solely from the 59 complaints closed Officer Unidentified. It is possible for individual allegations to be closed as officer unidentified in a complaint with a different overall disposition.

1.  **Case Example - Intentional concealment of shield numbers with mourning bands, Officer Unidentified[10]**

   On June 6, 2020, at approximately 7:00 p.m. in Brooklyn, a civilian was attending a candlelight vigil honoring Breonna Taylor when she saw a uniformed officer who had a mourning band over her shield. When the officer walked by, the civilian asked the officer if she could uncover her shield number. The officer ignored her and walked away. The civilian was able to describe the officer's race, height, and build, however, without additional descriptive details, pertinent video evidence, or other witnesses, the investigation was unable to determine the identity of the subject officer. The Board closed the allegations as Officer Unidentified.

### Challenge Two: Deployment of Officers Without Documentation of their Whereabouts or Issued Equipment

The CCRB uncovered numerous NYPD documentation and officer deployment tracking failures throughout the protests. In most instances, officers were deployed without tracking their whereabouts, which led to difficulty in determining the pool of officers from which subject officers could be identified. The CCRB found that NYPD detail rosters—rosters that track which officers are assigned to a precinct—were often incomplete and illegible, and crucial reports—such as TRI (Threat, Resistance, Injury) reports that document use of force and injuries to civilians and officers—often were not completed at all.

During their CCRB interviews, officers of various ranks stated that they could not identify the commanding officers who gave them directives and could not identify fellow ranked members of service with whom they had been deployed during the protests. Officers reported being deployed to multiple locations with officers from other precincts or reporting to other locations due to radio calls for assistance.

**Case Examples:** The cases below are examples of complaints where officers accused of misconduct could not be identified due to individual officer and departmental documentation failures.

1.  **Lack of NYPD paperwork, Officer Unidentified[11]**

   On May 31, 2020, at approximately 11:00 p.m. in the Midtown East area of Manhattan, the witness was with her boyfriend and a friend when she saw a marked police van driving amongst a group of protesters. The van made multiple turns while it was within the crowd, driving very close to some protestors, but not making physical contact with them. The witness took a photograph of the van and the license plate, but she could only describe the driver as a white male in uniform. The witness' friend also could not describe the driver. Surveillance video from two nearby commercial buildings showed the van driving in the crowd of protesters, but the cameras were too far away to capture a clear image of the driver. NYPD documents identified the van as being assigned to the 14th Precinct. A record of the

---

[10] CCRB Case No. 202003985
[11] CCRB Case No. 202003765

van's movements showed that it mostly circulated in the downtown Manhattan area. A search for BWC footage from the van's assigned precinct yielded negative results. The NYPD stated that due to the chaos of the protests it did not maintain a log of which officers took out the van. Without more specific officer descriptions, and the lack of documentation from the NYPD regarding the vehicle's assignment, the investigation was unable to determine the identity of the subject officers driving the vehicle and the complaint was closed as "Officer Unidentified."

2. **Officers' identities could not be determined because they wore inaccurate helmets and body shields or lacked any visible identification, Officer Unidentified**[12]

On June 4, 2020, at approximately 6:30 p.m. in the Mott Haven neighborhood of the Bronx, a civilian, a healthcare worker, and a friend were participating in a Black Lives Matter protest. At 7:30 p.m., officers began to encircle the protestors. When the curfew began at 8:00 p.m., the civilian witnessed his friend being arrested, officers grabbing a man off a bicycle and handcuffing him although he said that he was leaving the area, and several officers indiscriminately swinging their batons at protestors, sometimes making contact with their bodies. An officer approached the civilian and other nearby healthcare workers and threatened them with arrest if they did not leave. Another individual at this protest was struck by a baton, handcuffed, and escorted to a holding area where a large group of arrested protestors were being corralled. None of the civilians could fully describe the multitude of officers with whom they interacted.

The CCRB investigator reviewed hours of BWC footage, which showed that some officers were wearing riot helmets or riot shields with a shield number clearly printed on it. When the investigator interviewed the officers to whom those shield numbers were assigned, however, the officers stated that they were not the officers in the video and could not explain how the other officers had access to their equipment. NYPD records confirmed that the interviewed officers had been deployed to other locations in the city. As a result of the lack of documentation as to which officers were assigned the riot gear, the CCRB was unable to identify the officers engaged in the alleged misconduct and closed the complaint as "Officer Unidentified."

3. **Officers Submitted Illegible Paperwork Regarding Officer Deployments**[13]

On May 29, 2020, at approximately 9:00 pm in front of the 88th Precinct in Brooklyn, hundreds of protestors gathered for a Black Lives Matter protest. Several officers were stationed around the perimeter of the precinct. The precinct commander, Captain Ryon Malcolm, who was at a separate protest at Fort Greene Park at the time, stated that he heard a protestor say that the crowd was marching to the 88th Precinct. Cpt. Malcom requested a level two mobilization and went to the precinct himself. The NYPD could not produce documentation of the officers who

---

[12] CCRB Case No. 202005994
[13] CCRB Case No. 202004179

were deployed pursuant to Cpt. Malcolm's order. Cpt. Malcolm ordered the assembled officers to "push [protestors] on the sidewalk" and to "push them away." He stated that protestors were throwing objects and he witnessed one protestor smash a patrol car window.

The civilian and a friend were protesting outside the precinct when they were pushed to the ground and had batons shoved into their backs by unidentified officers. They, along with other protestors, were pushed into and pinned against a nearby fence by officers using riot shields. The civilian saw other protestors being wrestled to the ground.

The NYPD submitted the detail roster for the precinct, but most of its 59 pages were illegible. The few pages that were legible showed that officers from various commands were deployed to unknown locations within the boundary of the 88th Precinct. As a result, the CCRB could not identify which officers were present at the stationhouse and could have been involved in the alleged use of force against the civilian and the other protestors.

### 4. Officers Assembled from Multiple Precincts and Deployed Citywide Without Documentation of an Assignment[14]

On June 4, 2020, at approximately 7:30 pm in McCarren Park in Brooklyn, a large group of protestors gathered for a March Against Police Brutality. The protestors marched from the park towards the intersection of Penn Street and Wythe Avenue. The civilian participated in the march with his bicycle. The protestors were blocked at the intersection by 100 to 200 officers standing in a line. The civilian recorded several minutes of the standoff on his cellphone. The protestors began chanting and walking back up the street. The civilian stated that as he began walking away, he saw people running past him and then a white male officer in a white shirt pushed him backward. Another similarly dressed officer told the civilian to "get the fuck on the ground, get the fuck on the ground. Shut the fuck up. You wanted smoke, you got it" as he pushed the civilian. The civilian tripped and fell on the ground. He was surrounded by two to four unidentified officers and was punched on his upper body and head. The civilian started to yell that he was being assaulted and he was turned on his stomach and handcuffed. The civilian lost his eyeglasses after he was handcuffed and could not clearly make out the faces of the officers. The civilian stated that an unidentified officer crushed his eyeglasses with his foot. The civilian was transported from his arrest location without his bicycle, cellphone, and glasses. The civilian never received a voucher for any of his property. Officers interviewed regarding the McCarren Park protest stated that they had all been assigned to Randall's Island in Manhattan. The available NYPD paperwork showed that at least 175 officers (from different commands) were assigned to cover protest-related activity in Brooklyn North; none of the rosters identified specific deployment locations. The CCRB was unable to identify the officers engaged in the alleged misconduct and closed the complaint as "Officer Unidentified."

---

[14] CCRB Case Nos. 202004204, 202004071

**Challenge Three: Collection of BWC footage and other NYPD-controlled cameras**

CCRB investigators reported challenges in obtaining BWC footage from the multitude of protest complaints spanning the city. In several instances, this was because members of service failed to turn on their BWCs in situations mandated by the NYPD Patrol Guide or because the batteries in the BWCs lost their charge because of the duration of the protest deployment. There was also a backlog of unfulfilled BWC requests at the time of the summer protests.

There were challenges with obtaining video footage pursuant to a request submitted to the NYPD, which generally fell into the following categories:

- False positives[15] – the NYPD turned over footage that was either incorrect or irrelevant in response to a video request, resulting in investigators unnecessarily reviewing large amounts of footage.
- False negatives[16] – the NYPD reported that queries for the requested video footage did not return any results, but the footage was later discovered through other means.
- Inconsistent NYPD responses[17] – the NYPD found video footage that was responsive to multiple CCRB requests, but that footage was only sent back in response to some, but not all, of the pending requests.

The CCRB has discussed the existence of false negatives in previous reports as a result of the request, search, and response procedures currently in place in order for investigators to obtain BWC footage.[18] The CCRB does not have direct access to search for BWC footage, therefore investigators must submit a search request to the NYPD based on the information they are able to gather during the early stages of the investigation. After the NYPD conducts the search, it reports the results back to the investigator along with any video footage it was able to find or with a negative response if the query conducted by the NYPD did not produce any results.

The protests resulted in large volumes of recorded data due to increased officer deployments for long periods of time—this seems to have increased the incidence of false positive video data being provided by the NYPD, which CCRB investigators had to comb through before realizing that the video did not have any footage relevant to their investigation.

**Challenge Four: Extensive Delays in MOS Interviews**

For the first few months of the pandemic, the CCRB, like most offices and City agencies, operated remotely. This was for the safety of Agency staff, members of the public, and

---

[15] Case examples – CCRB Case Nos. 202005478, 202004729, 202006194
[16] Case examples – CCRB Case Nos. 202003782, 202004183, 202004586, 202004002, 202003731
[17] Case examples – CCRB Case Nos. 202003897, 202003969, 202004315, 202003782, 202004183
[18] https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20200227_BWCReport.pdf, pp. 53-56; https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/20190710_boardmtg_BWC_memo.pdf

members of the Department, in compliance with the state-wide[19] operational safety protocols. During that time, interviews with members of service were severely delayed because of union resistance to allowing its members to be interviewed remotely.[20] The CCRB announced that it would hold an emergency public board meeting on August 8, 2020, to inform the public of this issue.[21] A few days prior to the meeting, however, the NYPD issued a directive ordering members of service to participate in CCRB interviews or face departmental discipline.[22] This delay affected the closing time for complaints, which was further compounded by the previously discussed delay in document production from the Department.

---

[19] https://www.governor.ny.gov/sites/default/files/atoms/files/offices-interim-guidance.pdf
[20] https://gothamist.com/news/nypds-refusal-comply-misconduct-investigations-cost-months-time-and-effort
[21] https://livestream.com/accounts/8706161/events/3082869/videos/212780242
[22] https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-virtual-interview-civilian-complaint-review-board-20200806-myqry5ksb5c6fd3cseee6zccri-story.html

## PROTESTS WITH THE LARGEST NUMBER OF CCRB COMPLAINTS

The CCRB received 321 protest complaints that fell within its **F**orce, **A**buse of Authority, **D**iscourtesy, **O**ffensive Language, and **U**ntruthful Statements made during the course of a CCRB investigation (**FADO & U**) jurisdiction. The majority of complaints received by the CCRB stemmed from protests that took place in May and June of 2020 and occurred in Brooklyn and Manhattan. No complaints involved incidents occurring in Staten Island.

*Figure 3: Date and Location of Protest Complaints*

| Protest | Count | Protest | Count |
|---|---|---|---|
| 01. Manhattan - May 28, 2020 | 4 | 28. Manhattan - June 06, 2020 | 2 |
| 02. Barclays Center, Brooklyn - May 29, 2020 | 25 | 29. Queens - June 06, 2020 | 1 |
| 03. Brooklyn - May 29, 2020 | 9 | 30. Brooklyn - June 18, 2020 | 1 |
| 04. Manhattan - May 29, 2020 | 4 | 31. Manhattan - June 28, 2020 | 6 |
| 05. Flatbush, Brooklyn - May 30, 2020 | 28 | 32. Manhattan - June 30, 2020 | 3 |
| 06. Bowery, Manhattan - May 30, 2020 | 8 | 33. Manhattan - July 02, 2020 | 1 |
| 07. Dispersed, Manhattan - May 30, 2020 | 15 | 34. Brooklyn - July 12, 2020 | 1 |
| 08. Union Square, Manhattan - May 30, 2020 | 16 | 35. Queens - July 12, 2020 | 1 |
| 09. Queens - May 30, 2020 | 1 | 36. Manhattan - July 13, 2020 | 1 |
| 10. Brooklyn - May 31, 2020 | 5 | 37. Brooklyn - July 15, 2020 | 2 |
| 11. Manhattan - May 31, 2020 | 13 | 38. Manhattan - July 15, 2020 | 1 |
| 12. Bronx - June 01, 2020 | 2 | 39. Manhattan - July 24, 2020 | 2 |
| 13. Brooklyn - June 01, 2020 | 3 | 40. Manhattan - July 25, 2020 | 1 |
| 14. Manhattan - June 01, 2020 | 7 | 41. Manhattan - July 28, 2020 | 2 |
| 15. Bronx - June 02, 2020 | 2 | 42. Brooklyn - August 03, 2020 | 1 |
| 16. Brooklyn - June 02, 2020 | 3 | 43. Manhattan - August 07, 2020 | 1 |
| 17. Lower Manhattan - June 02, 2020 | 23 | 44. Manhattan - August 14, 2020 | 1 |
| 18. Manhattan - June 02, 2020 | 7 | 45. Brooklyn - September 12, 2020 | 1 |
| 19. Downtown Brooklyn - June 03, 2020 | 24 | 46. Manhattan - September 12, 2020 | 2 |
| 20. Manhattan - June 03, 2020 | 10 | 47. Manhattan - September 19, 2020 | 1 |
| 21. Brooklyn - June 04, 2020 | 14 | 48. Manhattan - September 26, 2020 | 2 |
| 22. Manhattan - June 04, 2020 | 4 | 49. Brooklyn - October 27, 2020 | 2 |
| 23. Mott Haven, Bronx - June 04, 2020 | 29 | 50. Manhattan - November 04, 2020 | 4 |
| 24. Brooklyn - June 05, 2020 | 4 | 51. Manhattan - November 05, 2020 | 1 |
| 25. Manhattan - June 05, 2020 | 1 | 52. Manhattan - November 21, 2020 | 1 |
| 26. Bronx - June 06, 2020 | 1 | 53. Manhattan - November 24, 2020 | 1 |
| 27. Brooklyn - June 06, 2020 | 3 | 54. Other | 13 |

*Figure 4: Protest Complaints by Borough*[23] [24]

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| Bronx | 779 (22%) | 34 (11%) |
| Brooklyn | 1,161 (32%) | 127 (40%) |
| Manhattan | 820 (23%) | 147 (46%) |
| Queens | 582 (16%) | 3 (1%) |
| Staten Island | 144 (4%) | |
| Outside NYC | 4 (0%) | |
| NA | 88 (2%) | 10 (3%) |

The following five protests resulted in the largest number of complaints: May 29, 2020 at Barclays Center in Brooklyn (25); May 30, 2020 in Flatbush, Brooklyn (28); June 2, 2020 in Lower Manhattan (23); June 3, 2020 in Downtown Brooklyn (24); and June 4, 2020 in Mott Haven, Bronx (29).

## MAY 29, 2020 – BARCLAYS CENTER, BROOKLYN

From approximately 7 p.m. to 11 p.m., thousands of people[25] gathered to protest in and around Barclays Center in Brooklyn. Some walked on streets and sidewalks with signs. Others were on bikes. Uniformed and plain clothes NYPD members of service responded with riot shields and/or helmets. Chief Jeffrey Maddrey, the highest-ranking Brooklyn borough commanding officer, responded to the protest location[26] along with Chief of Department Terence Monahan. Chief Monahan declared the assembly unlawful[27] because he observed the crowd throwing multiple objects at officers for a thirty-minute timespan. Chief Monahan then authorized Strategic Response Group (SRG) officers to clear the protest site using bicycles.[28]

The CCRB received numerous complaints from this protest, including allegations of officers arresting and threatening to arrest people without cause;[29] shoving protestors as they were walking in the street[30] or as they were complying with police directives to disperse;[31] striking protestors in the head with batons;[32] using offensive and derogatory language to address protesters;[33] and pepper-spraying a government official.[34]

---

[23] "NA" refers to complaints that did not describe a specific geographic location.
[24] Any blanks in charts represent zero
[25] https://www.netsdaily.com/2020/5/29/21275279/thousands-protesting-murder-of-george-floyd-at-barclays-center, https://yalereview.org/article/photographing-george-floyd-protests
[26] CCRB Case No. 202004729
[27] CCRB Case No. 202003695
[28] CCRB Case No. 202003695
[29] CCRB Case Nos. 202003770, 202003743
[30] CCRB Case Nos. 202003770, 202003753, 202003730
[31] CCRB Case Nos. 202003695, 202003731
[32] CCRB Case Nos. 202003715, 202003717
[33] CCRB Case Nos. 202003770, 202003715, 202003730
[34] CCRB Case No. 202003695

As seen below, complaints received from this protest primarily involved Use of Force and Abuse of Authority allegations.

*Figure 5: Barclays Center Protest: Complaints Containing FADO & U Allegations*

| | |
|---|---|
| Abuse of Authority | 12 |
| Discourtesy | 8 |
| Force | 24 |
| Offensive Language | 3 |
| Untruthful Statement | 3 |

## MAY 30, 2020 – FLATBUSH, BROOKLYN

In the Flatbush neighborhood of Brooklyn, from about 5 p.m. onwards, protestors gathered in the streets, holding signs, chanting, and yelling. Some protestors reportedly threw objects at police officers.[35] Officers in riot gear formed lines around protestors and walked alongside the crowd. The CCRB received a complaint that an officer pulled down an individual's COVID-19 mask to pepper spray him in the face.[36] Video of this incident was shown widely by news outlets and across social media.[37]

During this protest, two NYPD vehicles drove through a crowd of protestors. When protestors blocked one vehicle's path with a metal barricade, the officer driving the vehicle accelerated through the crowd with enough force to push the barricade and knock protestors to the ground.[38] Protestors threw garbage bags and other objects at the other police vehicle as it advanced through the crowd.

The CCRB received complaints that officers charged and tackled protestors;[39] used pepper spray indiscriminately,[40] purposely pepper sprayed protestors and a reporter in the face;[41] and did not provide medical attention to people who were pepper sprayed or injured by officers.[42] There were also allegations that officers shoved civilians with batons even as they complied with police directives to clear the way for police vehicles,[43] struck people with batons,[44] and shoved people to the ground.[45] An officer also allegedly used a riot shield to push an individual to the ground causing him to hit his head and pass out.[46] Part of the protest extended to the Brooklyn Bridge where the CCRB received complaints that

---

[35] CCRB Case No. 202006547
[36] CCRB Case No. 202003703
[37] https://pix11.com/news/local-news/watch-cop-pulls-mask-off-man-pepper-sprays-him-in-the-face/
[38] CCRB Case No. 202003710
[39] CCRB Case No. 202003788
[40] CCRB Case Nos. 202003805, 202006547
[41] CCRB Case Nos. 202006547, 202004408
[42] CCRB Case Nos. 202003703, 202005916, 202004474
[43] CCRB Case No. 202003797
[44] CCRB Case Nos. 202003797, 202005197, 202005916
[45] CCRB Case Nos. 202003788, 202005933, 202003790, 202003782
[46] CCRB Case No. 202004474

officers tackled protestors to the ground and struck them in the head with batons.[47]
Officers again drove vehicles through protestors, striking a protestor's bicycle.[48]

When questioned by the CCRB, several officers gave untruthful statements[49] about their
own or their colleagues' use of force[50] and about driving through the protestors.[51] As seen
below, complaints received from this protest primarily involved Use of Force and Abuse of
Authority allegations.

*Figure 6: Flatbush Protest: Complaints Containing FADO & U Allegations*

| | |
|---|---|
| Abuse of Authority | 15 |
| Discourtesy | 12 |
| Force | 25 |
| Offensive Language | 6 |
| Untruthful Statement | 4 |

## JUNE 2, 2020 – LOWER MANHATTAN

Due to the violence and destruction of property that occurred during some of the late night
protests, on June 1, 2020, then-Mayor Bill de Blasio issued Executive Order 117 declaring a
state of emergency in New York City and imposing a city-wide curfew from 11 p.m. on June
1 to 5 a.m. on June 2.[52] Mayor de Blasio made the announcement by calling in to Spectrum
News NY1 on the afternoon of June 1.[53] Executive Order 118 imposed a curfew from 8 p.m.
on June 2 to 5 a.m. on June 3, an advance of three hours from the start of the previous
night's curfew.[54] Executive Order 119 extended the curfew from June 2 through June 8.[55]
Only police officers, peace officers, firefighters, first responders and emergency medical
technicians, individuals traveling to and from or performing essential work, people
experiencing homelessness, and individuals seeking medical treatment or medical supplies
were permitted outside during curfew hours.[56] Non-exempt individuals who violated the
curfew were subject to arrest.[57]

In the Upper Manhattan area, crowds gathered in the afternoon and proceeded to march to
Lower Manhattan. NYPD officers followed the protestors. The CCRB received a complaint
that an officer refused to provide his name and badge number to a protestor.[58] Complaints
alleged that beginning shortly after 8 p.m., multiple officers moved into the crowd and

---

[47] CCRB Case Nos. 202003879, 202005197
[48] CCRB Case No. 202003854
[49] Untruthful statements occurred during interviews with CCRB investigators after the protests took place.
[50] CCRB Case Nos. 202003799, 202005916, 202003797
[51] CCRB Case Nos. 202003854
[52] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf
[53] https://www.ny1.com/nyc/all-boroughs/news/2020/06/01/new-york-city-curfew-protests
[54] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf
[55] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf
[56] *Id.*
[57] *Id.*
[58] CCRB Case No. 202003851

started striking protestors with batons,[59] sometimes with enough force to cause bone fractures.[60] Officers struck an individual with their batons as the person picked up their fallen cellphone that they had been using to record the police.[61] Part of the protest also passed by a Midtown precinct where NYPD supervisors tackled a reporter recording arrests, damaging his camera.[62] When protestors crossed the Manhattan Bridge, they were "stopped…by police barricading the bridge at its exit…[the] protesters became 'stuck' on the bridge, with blockades (also known as "kettling") on both sides."[63]

In Lower Manhattan, officers used profanity towards protestors as they complied with police directives to move.[64] Reporters who were trying to film officers making arrests were shoved with batons and arrested at the direction of NYPD supervisors.[65] The CCRB received complaints that officers struck an individual at the back of their neck with a baton,[66] struck people with batons while they were being handcuffed,[67] and pulled an individual to the ground by their hair when attempting to arrest them.[68] An essential worker going to work was tackled and arrested,[69] another was also arrested and alleged that officers struck him with batons while he passed a protest location.[70] Officers gave untruthful statements to CCRB investigators about using force against civilians.[71] As seen below, complaints received from this protest primarily involved Use of Force, Abuse of Authority, and Discourtesy allegations.

*Figure 7: Lower Manhattan Protest: Complaints Containing FADO & U Allegations*

| | |
|---|---:|
| Abuse of Authority | 13 |
| Discourtesy | 12 |
| Force | 20 |
| Offensive Language | 2 |
| Untruthful Statement | 2 |

## JUNE 3, 2020 – DOWNTOWN BROOKLYN

In the Cadman Plaza area of Downtown Brooklyn from approximately 7:00 p.m. onwards, groups of people gathered to protest. NYPD responded and formed lines around various groups of protestors. Chief Maddrey, the highest-ranked borough supervisor present, told

---

[59] CCRB Case Nos. 202004048, 202004002, 202100617, 202004684, 202100268
[60] CCRB Case Nos. 202004048, 202004002
[61] CCRB Case No. 202004203
[62] CCRB Case No. 202003860
[63] https://pix11.com/news/unrest-in-america/peaceful-protesters-stranded-on-manhattan-bridge-with-nypd-blockades-on-either-side; CCRB Case No. 202004035
[64] CCRB Case No. 202003834
[65] CCRB Case No. 202003834
[66] CCRB Case No. 202106215
[67] CCRB Case Nos. 202004222, 202004684
[68] CCRB Case No. 202004684
[69] CCRB Case No. 202004315
[70] CCRB Case No. 202004800
[71] CCRB Case Nos. 202004222, 202003860

officers to form a line to block off streets.[72] An officer used his baton to shove reporters who were covering the protest even though they clearly had their press credentials visible,[73] and some officers refused to identify themselves when asked even when such requests were made in the presence of other officers or a superior officer.[74]

When interviewed by the CCRB, an officer gave an untruthful statement about being in a vehicle that was at the scene of the protest,[75] other officers gave untruthful statements about using physical force against civilians.[76] As seen below, complaints received from this protest primarily involved Use of Force and Abuse of Authority allegations.

*Figure 8: Downtown Brooklyn Protest: Complaints Containing FADO & U Allegations*

| | |
|---|---|
| Abuse of Authority | 14 |
| Discourtesy | 10 |
| Force | 18 |
| Offensive Language | 5 |
| Untruthful Statement | 4 |

## JUNE 4, 2020 – MOTT HAVEN, BRONX

In the Mott Haven neighborhood of the Bronx, hundreds of people gathered to protest. NYPD Assistant Chief Kenneth Lehr,[77] the Bronx borough commanding officer, stated that in the afternoon before protestors began to assemble, he held a meeting with other commanding officers to discusses "strategies"[78] as the protest had become a "high priority event."[79] The strategies discussed by AC Lehr were "getting more personnel assigned…elements of the transit bureau…coordinate [with] members of…housing bureau (because of the Patterson Houses)…[and getting] SRG assigned."[80] AC Lehr stated that "we were deploying on the fly…we were making decisions in the street as this thing unfolded, and grew into a, a logical, you know, threat."[81] At about 7:30 p.m., multiple witnesses reported that officers started barricading several streets, using bicycles to stop the protestors from leaving the area—another instance of the use of "kettling."[82] Officers broadcasted an automated message telling everyone to leave the area,[83] but the protestors were unable to do so as they were penned in place by the police barricades and surrounding buildings.[84]

---

[72] CCRB Case No. 202004586
[73] CCRB Case No. 202003901
[74] CCRB Case Nos. 202004586, 202004110, 202004643
[75] CCRB Case No. 202003945
[76] CCRB Case Nos. 202003901, 202004990
[77] Chief Terrence Monahan and Assistant Chief Kenneth Lehr both retired before the CCRB completed this investigation.
[78] CCRB Case No. 202004142 January 19, 2021, Interview of Assistant Chief Kenneth Lehr
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] CCRB Case Nos. 202004883, 202004402
[83] CCRB Case Nos. 202004142, 202004183, 202006855
[84] CCRB Case Nos. 202004883, 202004402

The CCRB received complaints that some officers climbed on top of vehicles and struck protestors with batons,[85] indiscriminately pepper sprayed protestors,[86] used bicycles to strike protestors,[87] used discourteous and offensive language towards protestors,[88] zip tied protestors hands so tightly that they were numb,[89] and that an officer kicked a protestor in the face with his boots.[90] Medical personnel present at the protest stated that "there was an insufficient number to provide immediate medical assistance to all demonstrators injured by police violence."[91]

Despite being "part of a longstanding program by the National Lawyers Guild to monitor police conduct during protests,"[92] the CCRB received a complaint that legal observers— who are "third-party observers of protest movements whose sole function is to adequately safeguard individuals' rights,"[93] and who were clearly identifiable by their green hats[94]— were "zip-tied"[95] by officers who were advised by the Assistant Deputy Commissioner of NYPD Legal that "'legal observers were not exempt from enforcement.'"[96]
CCRB investigations into complaints arising from this protest determined that an officer gave an untruthful statement about being pushed by protesters,[97] while others obscured their badge numbers with mourning bands,[98] and that in some instances, there were no Threat, Resistance, Injury (TRI) reports on file even though officers are required to complete one when force is used against a civilian.[99] As seen below, complaints received from this protest primarily involved Use of Force allegations.

*Figure 9: Mott Haven Protest: Complaints Containing FADO & U Allegations*

| | |
|---|---|
| Abuse of Authority | 11 |
| Discourtesy | 11 |
| Force | 26 |
| Offensive Language | 3 |
| Untruthful Statement | 2 |

---

[85] CCRB Case Nos. 202100606, 202004183, 202004301
[86] CCRB Case Nos. 202100606, 202004402
[87] CCRB Case No. 202004301
[88] CCRB Case Nos. 202004055, 202004301, 202004183
[89] CCRB Case No. 202100495
[90] CCRB Case No. 202004055
[91] https://phr.org/our-work/resources/a-targeted-attack-on-the-bronx/
[92] https://www.hellgatenyc.com/nypd-lawyer-just-following-orders/; CCRB Case No. 202004142
[93] https://www.nycbar.org/media-listing/media/detail/statement-on-detention-of-legal-observers
[94] CCRB Case No. 202004142
[95] https://www.law.com/newyorklawjournal/2020/06/08/letter-demands-nypd-discipline-after-legal-observers-were-detained-illegally-searched-during-bronx-protest/; CCRB Case No. 202004142
[96] https://www.hellgatenyc.com/nypd-lawyer-just-following-orders/; CCRB Case No. 202004142
[97] CCRB Case No. 202004402
[98] CCRB Case No. 202004183
[99] CCRB Case Nos. 202004183, 202004301

**NYPD PROTEST RESPONSE**

Members of the public consistently reported allegations of excessive force and other misconduct during protests across the City. According to these reports, the NYPD deployed all manner of force—physical takedowns, baton strikes, pepper spray, and bicycle barricades against civilian protestors. The CCRB's investigations revealed that the forceful suppression of the protests occurred at the direction of high-level borough supervisors such as Assistant Chief Kenneth Lehr of the Bronx borough command, Bureau Chief Jeffrey Maddrey of the Brooklyn borough command, and various heads of precincts.

When interviewed by DOI on October 28, 2020, then-NYPD Chief of Department, Terence Monahan,[100] stated that "each commander who had eyes on the scene was given authority to make decisions that had to be made at that point in time…so every borough commander who's working was given authority to make decisions on what he had to do at each of these protests,"[101] and the commanding officers enforcing the curfew were "people from the SRG."[102] During his interview with CCRB investigators on March 5, 2021, Chief Monahan reiterated that were no "set rules" for engaging with protestors who were on the street during the curfew period in June 2020 "because every incident that [ ] was taking place…was unique…to the scene."[103] In a March 8, 2021, CCRB interview, Chief Monahan stated that the SRG unit "is the expert at large crowds. If arrests need to be made, SRG knows legally how [arrests] should be done."[104] Chief Monahan detailed to DOI the circumstances under which certain uses of force could be deployed. For example, pepper spray is "only supposed to be utilized when you are making an arrest. Unless it's utilized by the SRG under the direction of a captain or above."[105] Batons are only to be "utilized to gain control of a person that's resisting"[106] and the SRG unit is trained to use bicycles to push people along.[107] Chief Monahan testified that he had designated the May 29, 2020, protest at the Barclays Center an unlawful assembly and ordered SRG units to disperse the crowd.[108] Again, at the June 4, 2020, Mott Haven protest, which reportedly involved multiple objects being thrown at officers and crowds pushing against officers,[109] Chief Monahan personally ordered subordinate officers to place a protestor under arrest. He stated that after he saw that the officers "grabbed her… [he] walked away"[110] and was not aware of the additional force used by those officers to effectuate the arrest.[111]

In a January 19, 2021, CCRB interview, AC Lehr stated that at the June 4, 2020, Mott Haven protest, he decided to enforce the curfew because some of the protestors were in a standoff

---

[100] While Chief Monahan was the subject in the following investigations: CCRB Case Nos. 202003695, 202003717, 202003743, 202004408, 202005229, 202005916, 202006846, 202006855, and 202008019, Chief Monahan retired prior to the Board coming to a determination on those cases.

[101] https://www1.nyc.gov/assets/doi/oignypd/response/ChiefofDepartment_TerenceMonahan.pdf, pp. 9

[102] https://www1.nyc.gov/assets/doi/oignypd/response/ChiefofDepartment_TerenceMonahan.pdf, pp. 33

[103] CCRB Case No. 202004142, March 5, 2021, Interview of Chief Terrence Monahan

[104] CCRB Case No. 202003695, March 8, 2021, Interview of Chief Terrence Monahan

[105] https://www1.nyc.gov/assets/doi/oignypd/response/ChiefofDepartment_TerenceMonahan.pdf, pp. 45

[106] https://www1.nyc.gov/assets/doi/oignypd/response/ChiefofDepartment_TerenceMonahan.pdf, pp. 45

[107] CCRB Case No. 202003695, March 8, 2021, Interview of Chief Terrence Monahan

[108] CCRB Case No. 202003695, March 8, 2021, Interview of Chief Terrence Monahan

[109] CCRB Case No. 202003695, February 8, 2021, Interview of Bureau Chief Jeffrey Maddrey

[110] CCRB Case No. 202004142, March 5, 2021, Interview of Chief Terrence Monahan

[111] CCRB Case No. 202006855

with some of the officers and he was concerned about potential looting.[112] Chief Monahan recalled being informed by AC Lehr of his intent to arrest anyone who was on the streets when the 8:00 pm curfew went into effect.[113] Officers interviewed by the CCRB stated that they took an enforcement action such as seizing a bicycle[114] or effecting an arrest[115] because of the curfew.

Overall, the NYPD's response was criticized by several governmental entities. New York Attorney General (AG), Letitia James, stated that the NYPD displayed a "pattern of using excessive force and making false arrests against New Yorkers during peaceful protests,"[116] and DOI Commissioner, Margaret Garnett, stated that the "NYPD as an institution made a number of key errors or omissions that likely escalated tensions and the potential for violence, and certainly contributed to a public perception that the department was suppressing rather than facilitating lawful First Amendment assembly and expression."[117] In regards to the weeklong curfew, DOI found that "the gap between the Mayor's public statements and the NYPD's understanding of its enforcement authority derived from the Executive Order, set up needless confrontations between police and protesters and unfairly fueled public perceptions that the NYPD was abusing its authority."[118] The AG's report stated that when then-Police Commissioner Dermot Shea was asked whether officers received directives for policing protests that occurred after curfew, he "did not identify any specific directive given to officers, though noted that NYPD officers were advised to be 'as flexible as possible in allowing people to demonstrate, respecting their First Amendment rights, but also trying to balance that against the rights of individuals in New York City that want to go about their daily lives.'"[119]

---

[112] CCRB Case No. 202004142, January 19, 2021, Interview of Assistant Chief Kenneth Lehr

[113] CCRB Case No. 202004142, March 5, 2021, Interview of Chief Terrence Monahan

[114] CCRB Case No. 202005168

[115] CCRB Case No. 202005295

[116] https://www.npr.org/2021/01/14/956793786/new-york-state-sues-nypd-over-its-handling-of-2020-racial-justice-protests

[117] https://www.politico.com/news/2020/12/18/nypd-public-trust-protest-response-448415

[118] https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; pg 49

[119] https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf; pg 31

## FADO & U Allegations Received By The CCRB

The protest complaints the CCRB received contained more than 1,800 distinct allegations of police misconduct against members of the public. As shown in Figure 10, the largest percentage of these allegations were for Use of Force at 64%, followed by Abuse of Authority at 20%, and Discourtesy at 12%. Offensive Language and Untruthful Statement allegations made up 3% and 2% of the allegations, respectively. The percentage Use of Force allegations from the protest complaints was markedly higher than the percentage of Use of Force allegations in the non-protest complaints received in 2020 (22%).

*Figure 10: FADO & U Allegations Received*

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| Abuse of Authority | 9,328 (64%) | 376 (20%) |
| Discourtesy | 1,569 (11%) | 226 (12%) |
| Force | 3,221 (22%) | 1,193 (64%) |
| Offensive Language | 353 (2%) | 48 (3%) |
| Untruthful Statement | 118 (1%) | 30 (2%) |

*Figure 11: Complaints Containing FADO & U Allegations*

|  | 2020 CCRB (3,578 Complaints) | 2020 Protests (321 Complaints) |
|---|---|---|
| Abuse of Authority | 2,737 (77%) | 158 (49%) |
| Discourtesy | 982 (27%) | 120 (37%) |
| Force | 1,368 (38%) | 271 (84%) |
| Offensive Language | 266 (7%) | 35 (11%) |
| Untruthful Statement | 108 (3%) | 22 (7%) |

## USE OF FORCE ALLEGATIONS

Physical force (hand strikes, pushes, etc.,) was the most reported use of force allegation during the protests at 55%, followed by nightsticks (batons and asps) being used as clubs at 24%.[120] Nightsticks were employed by the NYPD at a far higher rate during the protests than other reported 2020 incidents, where nightsticks made up only 1% of the use of force allegations.[121] Allegations of improper use of pepper spray also increased significantly during the protests, accounting for 10% of protest allegations compared to 1% of 2020 non-protest allegations.[122]

*Figure 12: Force Allegations Received & Substantiated*

|  | 2020 CCRB Received | 2020 CCRB Substantiated | 2020 Protests Received | 2020 Protests Substantiated |
|---|---|---|---|---|
| Chokehold | 94 (3%) | 14 (10%) | 17 (1%) | 2 (1%) |
| Flashlight as club | 1 (0%) | | | |
| Gun as club | 4 (0%) | | | |
| Gun fired | 13 (0%) | | | |
| Gun Pointed | 227 (7%) | 8 (6%) | 2 (0%) | 1 (1%) |
| Handcuffs too tight | 22 (1%) | | 5 (0%) | |
| Hit against inanimate object | 79 (2%) | 2 (1%) | 23 (2%) | 4 (3%) |
| Less Than Lethal Force/Device | | | 1 (0%) | 1 (1%) |
| Nightstick as club (incl asp & baton) | 41 (1%) | 2 (1%) | 284 (24%) | 34 (24%) |
| Nonlethal restraining device | 108 (3%) | 6 (4%) | 3 (0%) | 1 (1%) |
| Other | 29 (1%) | | 20 (2%) | 1 (1%) |
| Other blunt instrument as a club | 9 (0%) | | 17 (1%) | 3 (2%) |
| Pepper spray | 27 (1%) | 7 (5%) | 117 (10%) | 28 (20%) |
| Physical force | 2,442 (76%) | 94 (67%) | 652 (55%) | 59 (42%) |
| Police shield | 2 (0%) | | 10 (1%) | |
| Radio as club | 2 (0%) | | | |
| Restricted Breathing | 97 (3%) | 7 (5%) | 26 (2%) | |
| Vehicle | 24 (1%) | | 16 (1%) | 6 (4%) |

**Case Examples:** Below are case examples involving allegations that members of service used force against civilians during the protests.

**Case One: Controlling Civilian Movements by Baton Strikes, Substantiated[123]**

On May 30, 2020, at approximately 10 p.m. in the Union Square area of Manhattan, the Victim, and his friend, both white males in their late twenties, were attending a George Floyd protest along with several other people. Several officers lined up and repeatedly moved towards the protestors, forcing them in one direction. The Victim's friend, who was

---

[120] *See* Figure 12.
[121] *Id*.
[122] *Id*.
[123] CCRB Case No. 202003847

recording the incident on his cellphone, captured Police Officer Brian Mahon striking the Victim's left arm with his baton. The momentum of the blow caused the Victim to stumble onto the sidewalk where PO Mahon swung his baton at the Victim's back. The Victim tried to move away when an unidentified woman stood between him and PO Mahon, but PO Mahon pushed the unidentified woman aside and continued to follow the Victim. PO Mahon again struck the Victim in his arm with the baton. The Victim's arm and back were bruised from the baton strikes.

During his CCRB interview, PO Mahon acknowledged pushing the Victim with his baton, but denied hitting the Victim with his baton, stating that had he done so, he would have broken the Victim's bones. PO Mahon stated that he swung his baton to get the Victim to leave the location as the NYPD had told the protestors to disperse. The Board substantiated Use of Force allegations against PO Mahon for striking the Victim with a baton and pushing the Victim and the unidentified woman, and an Untruthful Statement allegation for stating that he did not hit the Victim. The Board recommended Charges[124] for PO Mahon. The complaint is pending in the APU.

## Case Two: Pushing and Shoving People, Substantiated[125]

On May 29, 2020, at approximately 10:30 p.m. at a protest moving through Flatbush in Brooklyn, an unidentified male protester was pushed by Sergeant Matthew Peters. The Victim, who was standing on the sidewalk recording the protest, witnessed this and yelled for Sgt. Peters to leave the man alone. Sgt. Peters grabbed the Victim by the shirt and arm and pushed him down the street. Sgt. Peters then approached an unidentified female who was standing on the sidewalk and pushed her by the shoulder, causing her to stumble. Police Officer Osvaldo Nunez, who was standing close to Sgt. Peters, approached an unidentified male who held a cellphone in his left hand and pushed him in the right shoulder. The cellphone recording showed Sgt. Peters pushing the Victim and the two unidentified individuals. PO Nunez's BWC footage showed him pushing the unidentified male individual.

During his CCRB interview, Sgt. Peters stated that he was trying to disperse the crowd, but the video showed that the street where the incident occurred was predominantly filled with officers, and the people he pushed were not doing anything different from the other protestors to prompt Sgt. Peters to push them. PO Nunez claimed that he pushed the unidentified male because could not see his hands, but his BWC footage showed that the man had a cellphone in his hands and that PO Nunez independently approached him before pushing him. The Board substantiated Use of Force allegations against Sgt. Peters for pushing and shoving the Victim and the other individuals, and a Use of Force allegation against PO Nunez for pushing and shoving the unidentified male. The Board recommended

---

[124] The complaint was closed before the implementation of the NYPD Disciplinary Matrix.
[125] CCRB Case No. 202003731

Charges[126] for Sgt. Peters and Command Discipline A[127] for PO Nunez. The complaint against Sgt. Peters is pending in the APU.

**Case Three: Using Pepper Spray on Protesters, Substantiated[128]**

On May 30, 2020, at approximately 10 p.m. in the Flatbush area of Brooklyn, the Victim was among protesters who were facing down a line of police officers. Other groups of protestors were facing lines of officers that had approximately 25 to 30 officers each. Some protestors threw bottles at the officers. Officers ordered protestors to leave the street and move to the sidewalk. Some protestors pushed against the police line and officers began to initiate arrests. Some officers got into an altercation with the protestors. Police Officer Johnny Marquez pepper sprayed the protestors who were physically engaging with the officers. He then turned his pepper spray to the remaining protestors who were not breaching the police line. None of these protestors posed a threat to the officers. The Board substantiated a Use of Force allegation against PO Marquez for using pepper spray against the individuals in the crowd. The Board recommended Command Discipline B[129] for PO Marquez, but the Police Commissioner rejected the Board's recommendation[130] and did not discipline the officer.

**Case Four: Officers using force to apprehend looters during a protest, Within NYPD Guidelines[131]**

On June 1, 2020, at approximately 3:00 a.m. at a Footlocker store in the Soho area of Manhattan, two witnesses were taking photographs of protestors marching through the neighborhood. The witnesses observed individuals break into a Footlocker store and begin to carry out merchandise. Officers responded to the break-in approximately twenty minutes later and found the individuals still inside the store. They grabbed several individuals and used their batons to strike those who tried to flee. Officers ultimately arrested three individuals. The investigation found that the individuals resisted arrest and the brief use of force by the officers was proper as it allowed them to quickly apprehend the individuals for whom there was probable cause to arrest. The Board found that the officers' actions were Within NYPD Guidelines.

**Case Five: Use of force against a photojournalist without cause, Substantiated[132]**

On June 2, 2020, at approximately 9:30 p.m., a Black Lives Matter protest was taking place near the Midtown North Precinct stationhouse in Manhattan. A photojournalist for a local

---

[126] The Board substantiated two physical force allegations in the presumptive (no injury) category and 1 physical force allegation in the presumptive (injury) category of the Disciplinary Matrix. The presumptive (no injury) category carries a ten vacation days forfeiture penalty for each allegation and the presumptive (injury) category carries a ten suspension days plus ten vacation days forfeiture penalty.

[127] The Board substantiated one physical force allegation in the mitigation (no injury) category of the Disciplinary Matrix. The mitigation (no injury) category carries a five vacation days forfeiture penalty.

[128] CCRB Case No. 202006547

[129] The Board substantiated one pepper spray allegation in the mitigation (no injury) category of the Disciplinary Matrix, which carries a ten vacation days forfeiture penalty.

[130] https://www1.nyc.gov/assets/ccrb/downloads/pdf/complaints/complaint-outcomes/departure-letters/202006547-PO-Marquez.pdf

[131] CCRB Case No. 202008260

[132] CCRB Case No. 202003860

newspaper stood several feet away from a protestor being arrested and was taking photographs of the arrest. As he took photos, Sergeant Christopher Hewitson ran into the photographer and struck him with a baton, causing him to stumble backward. The photographer moved a few feet away from Sgt. Hewitson and attempted to hold up his press pass, which had been hanging around his neck. He shouted that he was press, but Sgt. Hewitson charged at him and pushed him to the ground with enough force that he landed hard on the sidewalk and sustained abrasions to his arms, legs, and cheek as a result. His camera also landed on the ground causing $800 in damage. The incident was captured on BWC and by recordings made by another reporter. At his CCRB interview, Sgt. Hewitson denied that he was the individual who used force against the photographer when he was shown video of the incident, stated that he only had incidental contact with civilians in the area as he told them to leave. The investigation determined that Sgt. Hewitson gave a false testimony that was designed to thwart his identification as the subject officer, and when confronted with credible evidence of his identity and his conduct, he maintained that he was not the officer captured in video and photographs and had not used force against any civilians. The Board substantiated Use of Force, Abuse of Authority, and Untruthful Statement allegations against Sgt. Hewitson. The Board recommended Charges against Sgt. Hewitson and the APU has served Charges on Sgt. Hewitson.

## ABUSE OF AUTHORITY ALLEGATIONS

Abuse of Authority allegations made up 20% of the total protest allegations as compared to 64% of overall allegations received in 2020.[133] The highest percentage of Abuse of Authority protest allegations were under the threat of force category, 17%, followed by refusal to provide shield number at 12%, and detainment at 11%.[134]

*Figure 13: Abuse of Authority Allegations Received & Substantiated*

| | 2020 CCRB Received | 2020 CCRB Substantiated | 2020 Protests Received | 2020 Protests Substantiated |
|---|---|---|---|---|
| Body Cavity Searches | 6 (0%) | 1 (0%) | | |
| Electronic device information deletion | 10 (0%) | 1 (0%) | 2 (1%) | |
| Entry of Premises | 802 (9%) | 63 (6%) | 1 (0%) | |
| Failed to Obtain Language Interpretation | 46 (0%) | 7 (1%) | | |
| Failure to provide RTKA card | 687 (7%) | 317 (31%) | 2 (1%) | |
| False Official Statements | | | 1 (0%) | |
| Forcible Removal to Hospital | 467 (5%) | 15 (1%) | | |
| Frisk | 495 (5%) | 66 (6%) | | |
| Gun Drawn | 70 (1%) | 1 (0%) | 1 (0%) | 1 (1%) |
| Improper dissemination of medical info | 7 (0%) | | | |
| Interference with recording | 138 (1%) | 12 (1%) | 32 (9%) | 10 (14%) |
| Other | 37 (0%) | 13 (1%) | | |
| Other: Detainment | 40 (0%) | 7 (1%) | 42 (11%) | 2 (3%) |
| Other: Obstructed Shield | 22 (0%) | 1 (0%) | 20 (5%) | 13 (18%) |
| Photography/Videography | 44 (0%) | 2 (0%) | 6 (2%) | 2 (3%) |
| Property damaged | 281 (3%) | 8 (1%) | 34 (9%) | 6 (8%) |
| Question | 191 (2%) | 7 (1%) | 7 (2%) | |
| Questioned immigration status | 5 (0%) | | | |
| Refusal to obtain medical treatment | 169 (2%) | 27 (3%) | 35 (9%) | 5 (7%) |
| Refusal to process civilian complaint | 154 (2%) | 26 (3%) | | |
| Refusal to provide name | 624 (7%) | 34 (3%) | 16 (4%) | 2 (3%) |
| Refusal to provide shield number | 642 (7%) | 60 (6%) | 45 (12%) | 16 (22%) |
| Refusal to show arrest warrant | 21 (0%) | | 2 (1%) | |
| Refusal to show search warrant | 30 (0%) | | | |
| Retaliatory arrest | 2 (0%) | | 2 (1%) | 2 (3%) |
| Retaliatory summons | 12 (0%) | 6 (1%) | 1 (0%) | |
| Search (of person) | 523 (6%) | 43 (4%) | 2 (1%) | |
| Search of Premises | 325 (3%) | 23 (2%) | | |
| Search of recording device | 30 (0%) | 4 (0%) | 1 (0%) | |
| Seizure of property | 160 (2%) | 4 (0%) | 17 (5%) | 3 (4%) |
| Sex Miscon (Humiliation: fail to cover) | 1 (0%) | | | |
| Sex Miscon (Sexual Harassment, Gesture) | 3 (0%) | | | |
| Sex Miscon (Sexual Harassment, Verbal) | 9 (0%) | 2 (0%) | | |
| Sex Miscon (Sexual/Romantic Proposition) | 2 (0%) | | | |
| Sex Miscon (Sexually Motivated Frisk) | 2 (0%) | | | |
| Sex Miscon (Sexually Motivated Search) | 4 (0%) | | | |
| Sexual Miscon (Forcible Touching) | 1 (0%) | | | |
| Sexual Miscon (Inappropriate Touching) | | | 1 (0%) | |
| Sexual Misconduct (Sexual Humiliation) | 8 (0%) | 1 (0%) | 1 (0%) | |
| Stop | 678 (7%) | 69 (7%) | 14 (4%) | 1 (1%) |
| Strip-searched | 51 (1%) | 5 (0%) | 2 (1%) | |
| Threat of arrest | 863 (9%) | 41 (4%) | 21 (6%) | 1 (1%) |
| Threat of force (verbal or physical) | 369 (4%) | 48 (5%) | 64 (17%) | 7 (10%) |
| Threat of summons | 88 (1%) | 4 (0%) | | |
| Threat re: immigration status | 2 (0%) | | | |
| Threat re: removal to hospital | 83 (1%) | 14 (1%) | | |
| Threat to damage/seize property | 100 (1%) | 14 (1%) | 2 (1%) | |
| Threat to notify ACS | 35 (0%) | 4 (0%) | | |
| Unlawful Arrest | 8 (0%) | 8 (1%) | 1 (0%) | 1 (1%) |
| Unlawful Summons | 3 (0%) | 3 (0%) | | |
| Vehicle search | 493 (5%) | 40 (4%) | | |
| Vehicle stop | 485 (5%) | 17 (2%) | 1 (0%) | |

---

[133] *See* Figure 10.
[134] *See* Figure 13.

**Case Examples:** Below are case examples where it was alleged that members of service abused their authority when interacting with civilians.

## Case One: Detaining People Without Cause During the Curfew, Substantiated[135]

On June 4, 2020, at approximately 8:30 p.m. in the Upper Westside of Manhattan, the Victim was working as a bicycle delivery person. Although a citywide curfew was in effect from 8 p.m., essential workers, such as delivery persons, were exempt from the curfew. The Victim stopped his bicycle to speak to officers who were arresting a woman whom he had seen jogging earlier that day in the area. Inspector Steven Ortiz decided to arrest the Victim for violation of curfew and disorderly conduct. Video footage showed that the Victim tried to inform officers that he had proof of employment as an essential worker on his phone, but he was ignored. The Board substantiated an allegation of Abuse of Authority against Ins. Ortiz for improperly detaining the Victim. The Board recommended Charges,[136] but the Police Commissioner retained the case and did not discipline Ins. Ortiz.

## Case Two: Failure to Provide Medical Attention, Substantiated[137]

On June 4, 2020, at approximately 9:30 p.m. in the Williamsburg area of Brooklyn, the Victim was marching in a protest when he was arrested. Police Officer Luis Negron was assigned as the arresting officer despite not being the officer who effectuated the arrest. The Victim was placed on a prisoner bus to be transported to central booking. He informed PO Negron that he required medical attention because his hand was broken, an injury sustained when another officer struck him with a baton. PO Negron mentioned "seeing a doctor" at central booking, but never followed up to make sure that the Victim received medical attention. Several hours later, after the Victim was released with a summons, he went to a hospital where he was diagnosed with a fractured finger, bruising to several parts of his body, and abrasions to his face and neck. The Board substantiated an Abuse of Authority allegation against PO Negron for failing to obtain medical attention for the Victim. The Board recommended Command Discipline A[138] for PO Negron. The Police Commissioner imposed the recommended Command Discipline A penalty.

## Case Three: Improper Arrest, Substantiated[139]

On September 26, 2020, at approximately 8:00 p.m. in Washington Square Park in Manhattan, the Victim and two friends came upon an event called "Art of the Protest." The Victim and his friends heard an NYPD message broadcast instructing the attendees to move onto to the sidewalk. The Victim and his friends were crossing the street in compliance with the instruction when Captain Christopher Treubig told a group of SRG bicycle officers to "grab this guy, grab him." Cpt. Treubig and the SRG officers rushed the Victim. As they closed in on him, Cpt. Treubig said "he's on fucking parole." The officers took the Victim

---

[135] CCRB Case No. 202003920
[136] The Board substantiated one abuse of authority – other allegation in the aggravating category of the Disciplinary Matrix, which carries a 15 vacation days forfeiture penalty.
[137] CCRB Case No. 202004071
[138] The Board substantiated one abuse of authority – refusal to obtain medical treatment allegation in the presumptive: negligent failure category of the Disciplinary Matrix, which carries a five vacation days forfeiture penalty.
[139] CCRB Case No. 202006494

down, and he became tangled in one of the police bicycles. After a few moments of tugging on the Victim's arms, as multiple officers pinned the Victim to the ground with their knees, the Victim was handcuffed. The incident was captured on BWC and Technical Assistance Response Unit (TARU) cameras, which showed that the Victim and his friends crossed the street as instructed by the broadcast message and that the Victim had not committed any parole violations. The Board substantiated Abuse of Authority and Discourtesy allegations against Cpt. Treubig. The Board recommended Charges[140] for Cpt. Treubig. The complaint is pending in the APU.

**Case Four: Improper Seizure of Property, Substantiated[141]**

On June 3, 2020, at approximately 9:00 p.m. in the Midtown East area of Manhattan, the Victim was attending a Black Lives Matter demonstration. The Victim was pushing his bicycle by the handlebars when he was approached by Sergeant Alberto Espinal who had been standing with a group of officers. Sgt. Espinal seized the Victim's bicycle and began walking away with it. The Victim took out his cellphone and began recording, asking Sgt. Espinal why he was taking his bicycle; Sgt. Espinal did not respond. The video showed Sgt. Espinal wheeling the bicycle past Deputy Chief Michael Pilecki, who was in charge that day. It also captured Sgt. Espinal seizing the bicycle of an unidentified individual. At his CCRB interview, Sgt. Espinal said that Deputy Chief Pilecki ordered him and the other officers to "take those bicycles" and "seize [the] bikes." Sgt. Espinal stated that the officers received no orders to voucher the seized property. Deputy Chief Pilecki stated during his CCRB interview that he told the officers to "take summons enforcement action," which entailed issuing a summons to an individual and issuing a voucher for any property seized. Police records indicated that no summons or property voucher was issued to the Victim for his confiscated bicycle. The allegations were only pled against Deputy Chief Pilecki because he was the superior officer on the scene. The Board substantiated the Abuse of Authority allegations against Deputy Chief Pilecki. The Board recommended Charges[142] for Deputy Chief Pilecki. The complaint is pending in the APU.

**Case Five: Officers Using Force Against Protestors, Within NYPD Guidelines[143]**

On July 28, 2020, at approximately 6:00 p.m. near Madison Square Park in Manhattan, a civilian joined a group of protestors at an Anti-Police Brutality protest. The protestors marched to the park and the civilian marched along with them while carrying his bicycle. They arrived at the interior of the park and the civilian stood with other bicyclists to act as a wall between the protestors and the police officers who had been following them. Multiple officers moved in to arrest the protestors. The civilian stated that the scene was very chaotic and three to four unidentified officers started arrested him by grabbing his arms.

---

[140] The Board substantiated one discourtesy – word allegation in the presumptive category of the Disciplinary Matrix, which carries a five vacation days forfeiture penalty and one abuse of authority – unlawful arrest allegation in the presumptive category of the Disciplinary Matrix, which carries a 20 vacation days forfeiture penalty.
[141] CCRB Case No. 202005168
[142] The Board substantiated two abuse of authority – seizure of property allegations in the aggravating category of the Disciplinary Matrix, which each carry a 15 vacation days forfeiture penalty.
[143] CCRB Case No. 202107262

The civilian, who had a history of dislocating his left shoulder, said that he resisted the officers' attempts to restrain his arms behind his back for fear that they would dislocate his shoulder again. The officers got the civilian to the ground, but the civilian laid on his side and refused to give his hands to be handcuffed. Detective Kaz Daughtry pulled out his taser as multiple officers yelled at the civilian to turn over. Det. Daughtry was captured on BWC telling the Victim "if you don't turn over, we're gonna taser you right now." The investigation determined that Det. Daughtry's threat of force was Within NYPD Guidelines because the civilian was resisting arrest.

## DISCOURTESY AND OFFENSIVE LANGUAGE ALLEGATIONS

Discourtesy allegations made up 12% of protest complaint allegations as compared to 11% of overall complaints received in 2020.[144] Offensive Language allegations made up 3% of total protest allegations as compared to 2% of overall allegations received in 2020.[145] Most of the Discourtesy allegations, 86%, were in the Word category, as shown in Figure 14, and most of the Offensive Language allegations, 46%, were in the Gender category, as shown in Figure 15.

Many officers who engaged in alleged acts of Discourtesy or Offensive Language, which includes officers who engaged in hate speech and displays of racism, did not face discipline for their actions. The Board was unable to identify the officers in 50% of fully investigated Discourtesy allegations,[146] and 34% of Offensive Language allegations.[147]

*Figure 14: Discourtesy Allegations Received & Substantiated*

|  | 2020 CCRB Received | 2020 CCRB Substantiated | 2020 Protests Received | 2020 Protests Substantiated |
|---|---|---|---|---|
| Action | 211 (13%) | 39 (12%) | 28 (12%) | 4 (17%) |
| Demeanor/tone | 12 (1%) |  | 2 (1%) |  |
| Gesture | 31 (2%) | 2 (1%) | 1 (0%) |  |
| Other | 16 (1%) | 7 (2%) | 1 (0%) |  |
| Word | 1,299 (83%) | 272 (85%) | 194 (86%) | 20 (83%) |

*Figure 15: Offensive Language Allegations Received & Substantiated*

|  | 2020 CCRB Received | 2020 CCRB Substantiated | 2020 Protests Received | 2020 Protests Substantiated |
|---|---|---|---|---|
| Disability | 8 (2%) |  |  |  |
| Ethnicity | 29 (8%) | 1 (2%) |  |  |
| Gender | 105 (30%) | 21 (38%) | 22 (46%) | 3 (33%) |
| Gender Identity | 4 (1%) |  | 3 (6%) | 2 (22%) |
| Other | 79 (22%) | 17 (30%) | 8 (17%) | 2 (22%) |
| Race | 87 (25%) | 11 (20%) | 11 (23%) | 2 (22%) |
| Religion | 8 (2%) |  |  |  |
| Sexual orientation | 33 (9%) | 6 (11%) | 4 (8%) |  |

**Case Examples:** Below are case examples involving allegations that members of service were discourteous and used offensive language towards civilians.

---

[144] *See* Figure 10.
[145] *Id*.
[146] *See* Appendix B, Figure 4.
[147] *See* Appendix B, Figure 5.

## Case One: Displays of Racism, Officers Unidentified[148]

On June 3, 2020, at approximately 11:15 p.m. in the Crown Heights area of Brooklyn, the Victim heard commotion on the street. When she went outside to determine the source of the noise, she observed approximately 20 uniformed police officers in riot helmets and armed with batons interacting with approximately 50 protesters. She saw the officers striking protestors with batons and arresting them using zip ties. Approximately 30 minutes later, the officers began to leave. The incident was captured on multiple cellphone videos. A tall, white, slightly heavy-set unidentified officer, dressed in a standard uniform and wearing a riot helmet, yelled "fuck you" to everyone outside and entered a marked police vehicle. As the police convoy drove away, one of the police loudspeakers played an ice cream song: "Ni**er Love a Watermelon."[149] CCRB investigators were able to identify the vehicle that the subject officer got into through the videos. Police records showed that vehicle had been loaned out to a different precinct. Precinct records showed that two officers were assigned to the vehicle, both of whom stated that they were not at the incident and were assigned to a stationary post at the time. Neither could account for how their assigned vehicle was at the incident. The Board determined that both officers made untruthful statements regarding the whereabouts of the vehicle but was unable to identify the officers involved in this incident because NYPD records did not accurately reflect which officers made use of the vehicle.

## Case Two: Displays of Racism, Substantiated[150]

On May 30, 2020, at approximately 11:00 p.m. in the Union Square area of Manhattan, the Victim and a friend were attending a George Floyd protest rally. The Victim's friend was livestreaming the protest and was facing the Victim who used the front facing camera on his phone to take a photo of himself. Police Officer Enrico Lauretta stood behind the Victim and used his left hand to make the white power symbol by forming his thumb and index finger into a circle and extending his fingers straight outwards and held his hand at shoulder height. He then turned to another officer next to him and smiled. The gesture was captured in the Victim's photograph. Major organizations that track hate groups and hate speech stated that this specific hand gesture has been adopted globally by white supremacists who make the gestures in photos and on video. PO Lauretta stated that he used his hand and fingers to make the symbol at a protestor who was talking in his ear and calling him names. PO Lauretta could not describe the person to whom he made the gesture. A video posted to the internet showed PO Lauretta making the symbol directly behind the Victim and then immediately turning to another officer and laughing about it. No civilian was captured talking to PO Lauretta during this incident. The Board substantiated one Offensive Language allegation against PO Lauretta for gesturing offensively towards the Victim. The Board recommended Charges[151] for PO Lauretta. The complaint is pending in the APU.

---

[148] CCRB Case No. 202003945

[149] https://www.npr.org/sections/codeswitch/2014/05/11/310708342/recall-that-ice-cream-truck-song-we-have-unpleasant-news-for-you

[150] CCRB Case No. 202003697

[151] The complaint was closed before the implementation of the NYPD Disciplinary Matrix.

**Case Three: Officer using force and speaking discourteously to a civilian at a protest, Within NYPD Guidelines[152]**

On May 30, 2020, at approximately 11:30 p.m. in the Union Square area of Manhattan, the complainant stopped to watch a protest on her way home from work. She saw police start to arrest protestors who had gotten too close to them. The police told everyone to leave the location. The complainant refused to leave because she was concerned about the people being arrested. The complainant stated that Inspector Michele Irizarry came up to her, picked her up by both of her arms, pushed her back into a fence and told her, "when I tell you to get out of the park, get out of the fucking park." The incident was captured on BWC. The footage showed the complainant standing approximately five to ten feet away from the officers who were arresting protestors. It showed Ins. Irizarry approach the individual, grab her arms, and push her lightly on the back in the direction of the stairs behind her. The individual walked towards the stairs. At the time, there was a large, hostile crowd of protestors who were pushing officers and there was a trash can on fire. The investigation determined that Ins. Irizarry used a brief restraint to ensure that the individual followed the instructions in a loud and chaotic environment. The use of profanity, while not captured on BWC, given the stressful and chaotic environment, was permissible under the circumstances. The Board found that Ins. Irizarry's actions were Within NYPD Guidelines.

---

[152] CCRB Case No. 202008249

## UNTRUTHFUL STATEMENT ALLEGATIONS

Pursuant to a change in the New York City Charter, in March 2020, the CCRB began investigating "the truthfulness of any material statement that is made within the course of the CCRB's investigation or the resolution of a complaint by a police officer who is the subject of that complaint."[153] Such conduct is now captured by the newly created Untruthful Statement allegation. CCRB investigators encountered numerous instances of officers making untruthful statements about their actions during the protests. As shown in Figure 16 below, false official statements were the largest category, 60% (18 allegations), of the untruthful statement allegations stemming from the protests.

Untruthful statement allegations fall into four categories:

1. **False Official Statement**: The false official statement allegation requires a showing by a preponderance of the evidence of three elements: (1) the officer who was the subject of a CCRB complaint made an intentional statement during the course of the CCRB investigation; (2) the officer knew the statement to be untrue; and (3) the statement was material to the outcome of the investigation.
2. **Misleading Official Statement**: Misleading statements are statements in which the officer intends to misdirect the fact finder and materially alter the narrative by omitting material facts, states repeatedly that they do not recall the event or specific actions when a reasonable person would be expected to recall or have been aware, or when officers materially alter their statement after being confronted with evidence which contradicts the initial statement.
3. **Inaccurate Official Statement**: This allegation does not require an intent to deceive, but the officer's testimony includes incorrect material information out of gross negligence about knowledge which the officer ought to possess.
4. **Impeding an Investigation**: This allegation is reserved for instances when "an officer engages in impeding actions" such as destroying digital or material evidence or refusing to provide said evidence.

*Figure 16: Untruthful Statements Allegations Received & Substantiated*

| | 2020 CCRB Received | 2020 CCRB Substantiated | 2020 Protests Received | 2020 Protests Substantiated |
|---|---|---|---|---|
| False official statement | 26 (22%) | 24 (50%) | 18 (60%) | 13 (54%) |
| Impeding an investigation | 66 (56%) | | 2 (7%) | 2 (8%) |
| Inaccurate official statement | 2 (2%) | 1 (2%) | | |
| Misleading official statement | 24 (20%) | 23 (48%) | 10 (33%) | 9 (38%) |

**Case Examples:** The following are case examples involving allegations that members of service made untruthful statements during the course of a CCRB investigation. As untruthful statement allegations can only arise after a CCRB investigation has begun, they are always accompanied by a separate FADO allegation.

---

[153] https://www1.nyc.gov/assets/charter/downloads/pdf/reports-ballot-issues/post-election-report-20191231.pdf

**Case One: Officer Engaged in Hate Speech and Giving Untruthful Statement, Substantiated**[154]

On June 3, 2020, and June 10, 2020, at approximately 12:00 p.m. in New York City, a Korean-American civilian with a YouTube channel uploaded two interviews with Detective Sergeant Won Chang to his public channel. DTS Chang, in Korean, discussed the summer protestors and made several comments that were demeaning to Black communities. DTS Chang positioned himself as a member of service when he made the comments. DTS Chang stated in the videos that "Black people who live here—please don't misunderstand, the Blacks I'm talking about here are the ones to just play, eat, and sleep (muk-go, nol-go, jah-go). These Black people who just play, eat, and sleep, pass on this lifestyle to their future generations," and that "we are not discriminating against all Blacks. There are Blacks who are educated, there are Blacks who are uneducated but act correctly and have good natures and hearts. And because Koreans have a lot of jung (affection/love), we treat them especially well. But I am talking about young Black people with criminal natures, not all Black people."

When DTS Chang was interviewed by the CCRB about the incidents, he stated that he did not recall if he appeared in the YouTube videos. Upon being showed the videos, however, he identified himself as the speaker. DTS Chang stated that the offensive statements were not specifically about the Black community because of a pronoun he used. After viewing the video, investigators stated to DTS Chang that the pronoun use immediately followed specific statements about the Black community. DTS Chang eventually agreed with the investigators' interpretation regarding a specific offensive statement about the Black community. The Board substantiated two Offensive Language allegations against DTS Chang for making derogatory remarks about Black people and one Untruthful Statement allegation for denying that he made the statements. The Board recommended Charges[155] for DTS Chang. DTS Chang retired before further action could be taken.

**Case Two: Officer Using Force and Giving Untruthful Statement, Substantiated**[156]

On June 2, 2020, at approximately 8:20 p.m. in Lower Manhattan, the witness observed protestors outside her apartment. She saw a male individual face down on the ground with several officers holding him down. She watched Sergeant Daniel Nicoletti walk up to the group of officers, raise his nightstick and use it to strike the male individual on his calves. The witness captured the incident on her cellphone. It was also captured on an officer's BWC. When Sgt. Nicoletti was interviewed by the CCRB, he stated that he did not recall striking anyone with a baton. He was shown the BWC footage of the incident and identified himself in the footage. He stated that he could not identify himself when shown the witness' cellphone footage. He also stated that the videos did not refresh his recollection about using his baton to strike a civilian. The investigation determined that Sgt. Nicoletti used his

---

[154] CCRB Case No. 202004550

[155] The Board substantiated one untruthful statement – misleading official statement allegation in the presumptive category of the Disciplinary Matrix, which carries 30 suspension days plus one year dismissal probation penalty and two offensive – race allegations in the presumptive category of the Disciplinary Matrix, which each carry a 20 vacation days forfeiture penalty.

[156] CCRB Case No. 202004222

baton to strike the male individual and that his statement that he did not recall using his baton was intentionally misleading.

The Board substantiated one Use of Force allegation against Sgt. Nicoletti for using force against the individual and one Untruthful Statement allegation for denying that he used force against the individual. The Board recommended Charges[157] for Sgt. Nicoletti, but the Police Commissioner retained the case and did not discipline Sgt. Nicoletti.

---

[157] The Board substantiated four force – nightstick as club allegations in the presumptive (serious injury), aggravating (no injury), aggravating (injury), and aggravating (serious injury) categories of the Disciplinary Matrix, which each carry a termination penalty, and one untruthful statement – misleading official statement allegation in the presumptive category of the Disciplinary Matrix, which carries 30 suspension days plus one year dismissal probation penalty.

## COMPLAINT DISPOSITIONS

When the CCRB is able to fully investigate a complaint, the Board resolves the misconduct allegations and complaints with one of the following five outcomes: Substantiated, Within NYPD Guidelines,[158] Unfounded, Unable to Determine,[159] and Officer Unidentified. A single complaint can involve multiple allegations against multiple members of service, and thus can contain multiple allegation dispositions. The disposition of a fully investigated complaint depends on the disposition of the fully investigated allegations within the complaint.

Of the 226 fully investigated complaints, the Board substantiated 88 complaints containing 269 allegations against 146 individual officers.[160] More than half of the substantiated allegations were for excessive use of force (140 allegations, 52%), mostly involving physical force and the improper use of batons and pepper spray.[161] The Board also substantiated numerous abuse of authority allegations, including 31 allegations (12% of substantiated allegations) that officers refused to provide their name and/or shield number or obstructed their shield number.[162] The Board substantiated 24 allegations (9% of substantiated allegations) of discourteous words or gestures and nine allegations of offensive language.[163]

For non-substantiated complaints, the Board determined that 18 complaints were Within NYPD Guidelines; was Unable to Determine whether there was misconduct in 50 complaints; determined that 11 complaints were Unfounded; and was unable to identify the officers involved in 59 complaints.[164]

*Figure 17: Fully Investigated Complaint Dispositions*

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| Substantiated | 493 (34%) | 88 (39%) |
| Unable to Determine | 424 (29%) | 50 (22%) |
| Within NYPD Guidelines | 216 (15%) | 18 (8%) |
| Unfounded | 162 (11%) | 11 (5%) |
| Officer(s) Unidentified | 143 (10%) | 59 (26%) |

---

[158] Within NYPD Guidelines is reported to the Police Commissioner as Exonerated.
[159] Unable to Determine is reported to the Police Commissioner as Unsubstantiated.
[160] *See* Figure 17.
[161] *See* Appendix B, Figure 2.
[162] *See* Appendix B, Figure 3.
[163] *See* Figure 18.
[164] *See* Figure 17.

*Figure 18: Fully Investigated Allegation Dispositions*

| | | 2020 CCRB | 2020 Protests |
|---|---|---|---|
| Substantiated | Abuse of Authority | 1,018 (12%) | 72 (5%) |
| | Discourtesy | 320 (4%) | 24 (2%) |
| | Force | 140 (2%) | 140 (10%) |
| | Offensive Language | 56 (1%) | 9 (1%) |
| | Untruthful Statement | 48 (1%) | 24 (2%) |
| | Sub Total | 1,582 (19%) | 269 (19%) |
| Unable to Determine | Abuse of Authority | 1,500 (18%) | 40 (3%) |
| | Discourtesy | 263 (3%) | 29 (2%) |
| | Force | 347 (4%) | 144 (10%) |
| | Offensive Language | 71 (1%) | 16 (1%) |
| | Untruthful Statement | 4 (0%) | 6 (0%) |
| | Sub Total | 2,185 (26%) | 235 (17%) |
| Within NYPD Guidelines | Abuse of Authority | 1,922 (23%) | 36 (3%) |
| | Discourtesy | 114 (1%) | 33 (2%) |
| | Force | 656 (8%) | 166 (12%) |
| | Offensive Language | 3 (0%) | |
| | Sub Total | 2,695 (32%) | 235 (17%) |
| Unfounded | Abuse of Authority | 561 (7%) | 22 (2%) |
| | Discourtesy | 143 (2%) | 12 (1%) |
| | Force | 306 (4%) | 20 (1%) |
| | Offensive Language | 25 (0%) | |
| | Sub Total | 1,035 (12%) | 54 (4%) |
| Officer(s) Unidentified | Abuse of Authority | 579 (7%) | 102 (7%) |
| | Discourtesy | 140 (2%) | 97 (7%) |
| | Force | 127 (2%) | 397 (28%) |
| | Offensive Language | 45 (1%) | 13 (1%) |
| | Sub Total | 891 (11%) | 609 (43%) |

The Board determined that 235 allegations were Within NYPD Guidelines,[165] including 109 physical force allegations, 36 nightstick/baton allegations, and nine pepper spray allegations.[166] It was Unable to Determine 235 allegations,[167] including, whether misconduct occurred for 72 physical force allegations, 34 nightstick/baton allegations, and 16 pepper spray allegations.[168] Of the 54 allegations that the Board Unfounded,[169] 10 involved physical force, two involved nightstick/baton use, and one involved the use of pepper spray.[170] The

---

[165] *See* Figure 18.
[166] *See* Appendix B, Figure 2.
[167] *See* Figure 18.
[168] *See* Appendix B, Figure 2.
[169] *See* Figure 18.
[170] *See* Appendix B, Figure 2.

Board also determined that 13 allegations involving refusal to provide name/shield or the obstruction of a shield were Unfounded.[171]

More fully investigated allegations were closed as "Officer Unidentified" (609 allegations) than any other disposition category, as shown in Figure 18. This further demonstrates how pervasive the officer identification challenges were throughout the protest investigations, which prevented the Board from holding officers who engaged in misconduct accountable for their actions.

---

[171] *See* Appendix B, Figure 3.

## DISCIPLINARY RECOMMENDATIONS

After the Board substantiates an allegation of misconduct, it makes a discipline recommendation to the Police Commissioner who has final authority over what penalty, if any, should be imposed on the officer. In 2021, pursuant to Memorandum of Understanding (MOU) with the NYPD,[172] the Board began using the NYPD's Disciplinary System Penalty Guidelines, often referred to as the Disciplinary Matrix,[173] to determine its discipline recommendations. Using the Disciplinary Matrix should result in more consistent discipline recommendations from the CCRB, and consequently, less deviations by the Police Commissioner.

The Disciplinary Matrix provides a penalty for each type of misconduct. If there are multiple substantiated allegations of misconduct, the penalty for each allegation might be added together to arrive at the overall penalty for an officer. Based on the overall penalty, the CCRB selects one of the following disciplinary recommendations:

- Less than 1 day: Training[174]
- 1–5 days: Command Discipline A[175]
- 6–10 days: Command Discipline B[176]
- 11+ days: Charges and Specifications[177]

As shown in Figure 19, the Board used the Disciplinary Matrix to make penalty recommendations in 74 of the 88 total substantiated protest complaints; the other 14 substantiated complaints were determined before the CCRB's implementation of the Disciplinary Matrix. The Board recommended Charges and Specifications for 89 officers, Command Discipline B for 26 officers, and Command Discipline A for 31 officers.[178] The Board did not recommend Instructions[179] or Training for any officer who engaged in misconduct during the protests.

---

[172] The MOU can be found here: https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-ccrb-discipline-matrix-mou-final.pdf
[173] The version of the NYPD Disciplinary Guidelines that went into effect in January 2021 can be found here: https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf The updated Guidelines, effective February 15, 2022, can be found here: https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-disciplinary-penalty-guidelines-effective-2-15-2022-final.pdf
[174] Given at the Police Academy or the Legal Bureau.
[175] Issued by the commanding officer and may include a penalty ranging from a reprimand up to the officer forfeiting five vacation days.
[176] Issued by the commanding officer and may include a penalty ranging from a reprimand up to the officer forfeiting ten vacation days.
[177] Leads to a prosecutorial process in which officer may either plead guilty or go to trial before the NYPD Deputy Commissioner of Trials or an Assistant Deputy Commissioner of Trials.
[178] *See* Figure 20.
[179] Guidance issued by a commanding officer.

*Figure 19: Substantiated Protest Complaints*

|  | Pre-Matrix | Matrix | Total |
|---|---|---|---|
| Substantiated (Charges) | 2 (14%) | 56 (76%) | 58 (66%) |
| Substantiated (Command Discipline B) | 2 (14%) | 11 (15%) | 13 (15%) |
| Substantiated (Command Discipline A) | 10 (71%) | 7 (9%) | 17 (19%) |

*Figure 20: Board Penalty Recommendations for Substantiated MOS in Protest Complaints*

|  | Pre-Matrix | Matrix | Total |
|---|---|---|---|
| Substantiated (Charges) | 2 (10%) | 87 (69%) | 89 (61%) |
| Substantiated (Command Discipline B) | 2 (10%) | 24 (19%) | 26 (18%) |
| Substantiated (Command Discipline A) | 16 (80%) | 15 (12%) | 31 (21%) |

After the Board sends its disciplinary recommendation to the Police Commissioner, the case against that officer can be resolved in one of the following ways:

1. If the Board recommended Instructions, Formalized Training, Command Discipline A, or Command Discipline B, the Police Commissioner determines whether to impose discipline. If the Police Commissioner chooses not to impose a recommended discipline, the CCRB is informed in writing of the decision. [180]

2. If the Board recommended Charges and Specifications:
   a. The Police Commissioner can retain case and choose whether to impose discipline.[181]
   b. The officer can accept a guilty plea, subject Police Commissioner approval.[182]
   c. The officer can be prosecuted by the APU at an administrative trial. The Police Commissioner can accept or reject the trial verdict and decide whether to impose discipline.

For cases where the Board recommended Command Discipline A or Command Discipline B, the Police Commissioner did not impose discipline in 18 cases, as shown in Figure 21. The Police Commissioner imposed a lower level of discipline than recommended by the Board in four cases. The Police Commissioner has yet to issue a final disciplinary determination for four cases.[183] Three officers resigned or retired before discipline could be imposed.[184]

---

[180] This letter differs from the letter sent when the Police Commissioner deviates from the Board's recommendation.
[181] Pursuant to a MOU between the CCRB and the NYPD, the Police Commissioner can retain a case when the Police Commissioner determines that the CCRB's prosecution of a case would be detrimental to the NYPD's disciplinary process. The MOU can be found here:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf.
[182] The APU may reach an agreed upon disposition with the subject officer that is different from the Board-recommended penalty if there are new aggravating or mitigating facts.
[183] *See* Figure 23.
[184] *See* Figure 21.

Two officers elected to go to trial instead of accepting the Command Discipline recommended by the Board; their cases were forwarded to the APU for prosecution.[185]

The Police Commissioner retained 13 cases where the Board recommended Charges and Specifications, imposing discipline on four officers.[186] In two cases, the officers forfeited 10 vacation days. In a third case, the officer forfeited 5 vacation days and in a fourth case, the officer forfeited three vacation days.[187] For the other 9 retained cases—which involved allegations such as improper pepper spray deployment,[188] the use of physical force to either disperse[189] or arrest protestors,[190] and giving a misleading statement[191]—the Police Commissioner declined to impose any discipline or take any instructional/corrective action at all.[192]

*Figure 21: NYPD Discipline Imposed in Non-APU Protest Cases*

| Action | Board Recommendation | NYPD Discipline | Count |
|---|---|---|---|
| Disciplinary Action | Command Discipline A | Command Discipline A | 21 |
| | | Formalized Training | 1 |
| | | Closed Administratively (with Command Discipline B) | 1 |
| | Command Discipline B | Command Discipline B | 4 |
| | | Command Discipline A | 2 |
| | | Formalized Training | 1 |
| | Sub Total | | 30 |
| No Disciplinary Action | Command Discipline A | Resigned | 1 |
| | | No Discipline | 3 |
| | Command Discipline B | Retired | 2 |
| | | No Discipline | 15 |
| | Sub Total | | 21 |
| Non-APU Total | | | 51 |

[185] *See* Figure 24.
[186] *See* Figure 22.
[187] *Id.*
[188] CCRB Case No. 202003712
[189] CCRB Case No. 202003980
[190] CCRB Case No. 202004222
[191] CCRB Case No. 202004300
[192] *See* Figure 22.

Figure 22: NYPD Discipline Imposed in APU Protest Cases[193]

| Disciplinary Action | Closed: Resolved by plea | Forfeit vacation 15 days | 1 |
|---|---|---|---|
| | | Forfeit vacation 11 days | 1 |
| | | Forfeit vacation 10 days | 1 |
| | Closed: Previously adjudicated, with discipline | Dismissal Probation | 1 |
| | | Forfeit vacation 10 days | 1 |
| | | Instructions | 1 |
| | | Warned and admonished | 1 |
| | Closed: Retained, with discipline | Forfeit vacation 10 days | 2 |
| | | Forfeit vacation 5 days | 1 |
| | | Forfeit vacation 3 days | 1 |
| | Closed: Plea set aside, Comm. Disc. A | Forfeit vacation 1 day | 1 |
| | Sub Total | | 12 |
| No Disciplinary Action | Closed: Retained, without discipline | No penalty | 9 |
| | Closed: Retired | | 4 |
| | Closed: Resigned | | 1 |
| | Closed: SOL Expired prior to APU | | 1 |
| | Sub Total | | 15 |
| APU Total | | | 27 |

Figure 23: Case Pending Final NYPD Discipline Decision in Non-APU Protest Cases

| Substantiated (Command Discipline A) | 3 |
|---|---|
| Substantiated (Command Discipline B) | 1 |
| Total | 4 |

The administrative prosecution portion of the disciplinary process for substantiated cases being handled by the APU has just gotten underway. As shown in Figure 24, there are 62 cases pending in the APU that are at various stages of prosecution.[194] In one case, the CCRB has filed charges and is awaiting service of the charges upon the officer by the NYPD so that the administrative disciplinary process can begin. The APU conducted five protest trials so far that are awaiting final disposition.[195] Officers in two cases have entered guilty pleas that

---

[193] Emergency Executive Orders issued by the Governor tolled the 18-month statute of limitations for disciplinary proceedings from March 20 to November 3, 2020. The tolling provided more time to investigate complaints given the remote work and social distancing requirements imposed during the pandemic that also contributed to overall investigative delays.

[194] An additional two cases are pending in the APU after the subject officers rejected the Command Discipline imposed by the Police Commissioner and elected to go to trial instead, for a total of 72 cases pending in the APU.

[195] CCRB Case No. 202003695

are pending Police Commissioner review.[196] Guilty pleas have been approved by the Police Commissioner in three cases.

*Figure 24: APU Stage of Cases Pending NYPD Discipline in APU Protest Cases*

Officers For Whom The Board Recommended Charges

| | |
|---|---|
| Awaiting filing of charges | 1 |
| Calendared for court appearance | 1 |
| Charges filed, awaiting service | 1 |
| Charges served, awaiting initial court appearance | 42 |
| Plea agreed - paperwork pending | 4 |
| Plea filed - awaiting approval by PC | 2 |
| Previously adjudicated | 1 |
| Trial completed, awaiting verdict | 2 |
| Trial scheduled | 3 |
| Verdict rendered - awaiting approval by PC | 5 |
| Total | 62 |

Officers Forwarded To APU After Refusing Command Discipline

| | |
|---|---|
| Charges served, awaiting initial court appearance | 1 |
| Verdict rendered - awaiting approval by PC | 1 |
| Total | 2 |

---

[196] CCRB Case Nos. 202004301, 202004307

## COMPLAINANT DEMOGRAPHICS

This section details the demographics of the individuals who filed the complaint or were the victim of the alleged police misconduct.

*Figure 25: Gender Identity of Victims & Alleged Victims*

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| Female/Woman | 1,500 (31%) | 190 (25%) |
| Male/Man | 2,724 (56%) | 259 (34%) |
| TGNC | 14 (0%) | 17 (2%) |
| NA | 599 (12%) | 289 (38%) |

*Figure 26: Race & Ethnicity of Victims & Alleged Victims*

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| American Indian | 22 (0%) | |
| Asian | 120 (2%) | 17 (2%) |
| Black | 1,680 (35%) | 94 (12%) |
| Hispanic | 733 (15%) | 59 (8%) |
| White | 512 (11%) | 206 (27%) |
| Other Race | 146 (3%) | 24 (3%) |
| Refused | 103 (2%) | 8 (1%) |
| Unknown | 1,521 (31%) | 347 (46%) |

The vast majority of protest complaints, 52%, came from complainants who were between the ages of 20 and 40.

*Figure 27: Age of Victims & Alleged Victims*

|  | 2020 CCRB | 2020 Protests |
|---|---|---|
| 00 < Age <= 09 | 18 (0%) |  |
| 09 < Age <= 14 | 45 (1%) |  |
| 14 < Age <= 17 | 129 (3%) | 5 (1%) |
| 17 < Age <= 20 | 208 (4%) | 22 (3%) |
| 20 < Age <= 24 | 410 (8%) | 98 (13%) |
| 24 < Age <= 29 | 671 (14%) | 127 (17%) |
| 29 < Age <= 34 | 642 (13%) | 120 (16%) |
| 34 < Age <= 39 | 467 (10%) | 45 (6%) |
| 39 < Age <= 44 | 362 (7%) | 16 (2%) |
| 44 < Age <= 49 | 265 (5%) | 5 (1%) |
| 49 < Age <= 54 | 298 (6%) | 6 (1%) |
| 54 < Age <= 59 | 217 (4%) | 1 (0%) |
| 59 < Age <= 64 | 119 (2%) | 4 (1%) |
| 64 < Age <= 69 | 74 (2%) | 1 (0%) |
| 69 < Age <= 74 | 37 (1%) |  |
| 74 < Age <= 79 | 16 (0%) |  |
| 79 < Age <= 99 | 13 (0%) |  |
| NA | 846 (17%) | 305 (40%) |

These figures seem to indicate that the gender, race, and ethnicity demographics of the victims/alleged victims in the protest complaints were significantly different from the victim/alleged victim demographics in overall 2020 complaints. For example, only 34% of protest victims/alleged victims identified as male compared to 56% of overall 2020 victims/alleged victims,[197] 27% of protest victims/alleged victims identified as White compared to 11% of overall 2020 victims/alleged victims,[198] and only 12% of protest victims/alleged victims identified as Black compared to 35% of overall 2020 victims/alleged victims.[199] Given the large percentages of protest victims/alleged victims for whom the CCRB does not have any demographic information, however, these numbers may not accurately represent the demographics of the victims/alleged victims in the protest complaints. This is likely attributable to the fact that a large number of protest complaints were initially filed through the CCRB's website, social media, or recorded message and the person filing the complaint did not provide that information.

---

[197] *See* Figure 25.
[198] *See* Figure 26.
[199] *Id*.

## RECOMMENDATIONS

The CCRB's exhaustive and in-depth investigations into the complaints it received regarding the protests revealed abuse and infringement of First Amendment rights by members of the NYPD. To prevent future abuses, the CCRB believes that there are common sense changes that the NYPD can make to its practices. The adoption of these recommendations will vastly improve the CCRB's ability to identify members of service accused of misconduct and to accurately and timely access relevant investigatory evidence, which are crucial to holding members of service accountable.

1. All members of service should receive updated and routine training on the proper use of crowd control tactics during large-scale events, including the proper use of pepper spray and batons, and the NYPD should keep track of the level of training received by officers.
2. Officer names and shield numbers should be clearly visible so that officers are easily identifiable.
3. Police should not take action against civilians who are complying with police orders to disperse.
4. Police should not interfere with legal observers and members of the press who are acting in their official capacities to document protest activity and protect First Amendment rights.
5. Officers should be assigned equipment that reflects their name and/or shield numbers. Where that is not possible, an accurate record should be kept of which officers were given each piece of riot gear so that they can be readily identified. Officer names and precinct numbers should be visible in prominent locations on helmets and riot shields.
6. Each precinct should keep a log of which members of service use departmental vehicles and members of service should report what department-issued vehicles they used during their shifts.
7. Superiors should clearly identify themselves to officers at the beginning of shifts and/or before issuing commands.
8. Officers should be given the name of the superiors to whom they will be reporting, if not their regular supervisor, and an accurate record should be kept of temporary supervision assignments.
9. High-ranking members of service (whom do not have shield numbers) should have their names and commands visible in large font on their clothing.
10. The NYPD should log which officers respond to radio calls of other officers in need of assistance.
11. BWCs must be turned on for any officer who places a distress call.
12. Supervisors who take command of public demonstrations must be equipped with BWCs and must turn them on.
13. All department-issued devices with GPS tracking capabilities, such as BWCs, should be activated at the onset of interactions with civilians.
14. The NYPD should include BWC searches on all Internal Affairs Bureau (IAB) referral logs and link digital memo book entries to the appropriate BWC footage (as previously mentioned in the CCRB's BWC report) so that CCRB investigators are provided with this evidence when the case is referred.

15. The CCRB should be authorized to directly access and search NYPD BWC footage. This would significantly improve responsive BWC collection and increase the likelihood of reaching a disposition on the merits.
16. The NYPD should set up designated medical treatment areas with FDNY staff and EMTs on duty so that civilian injuries can be addressed quickly and before they are transported for detainment or arrest processing.
17. Officers should provide property voucher cards whenever they seize property.