UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PASTOR ADEN RUSFELDT,

                        Plaintiff,                            22-cv-594 (PKC)

               -against-                         <u>OPINION AND ORDER</u>

CITY OF NEW YORK, NEW YORK;
KEECHANT SEWELL, in her Official
Capacity as Commissioner of the City of New
York Police Department; and STEPHEN
HUGHES, in his Individual Capacity,

                        Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Pastor Aden Rusfeldt brings claims arising from his interactions with and arrest by officers of the New York City Police Department ("NYPD") that occurred while he was holding up a large sign on a long pole reading "Fags and Whores Burn in Hell" at the June 27, 2021 PrideFest in Manhattan.  He asserts violations of his First Amendment right to free speech, First Amendment right to free exercise of religion, Fourth Amendment protection against unreasonable seizure, and his Fourteenth Amendment rights to equal protection and due process against the City of New York, the Commissioner of the NYPD in his or her official capacity, and Stephen Hughes in his individual capacity.  Rusfeldt and the defendants have filed cross-motions for summary judgment on Rusfeldt's claims for constitutional injuries.

        The First Amendment protects Rusfeldt's right to express his message and the Pride festivalgoers' right to express their hostility to his message.  The expressive elements of Rusfeldt's hateful message and the festivalgoers' expressed antipathy to the message do not require law enforcement to turn a blind eye to the potential that the physical proximity of the two

1

groups could lead to unlawful behavior.  But the permissible means to mitigate the potential for escalation cannot be the removal of a person engaging in protected speech merely to appease others offended by his expressive activity.  Provocations to immediate violence may change the calculus.

When police officers learned that objects and liquids had been thrown by members of the crowd of Pride festivalgoers in the direction of Rusfeldt, they stepped into action.  They could have ordered the crowd dispersed or arrested an offender, if the person was observed and could be identified and apprehended.  Police officers selected a different response, at first standing in between Rusfeldt's group and the crowd and then moving metal barriers into place between the two groups, which did not impair the ability of Rusfeldt or the festivalgoers to deliver their messages.

Law enforcement also had concerns that Rusfeldt was on the sidewalk with a long pole holding his message aloft, potentially blocking the sidewalk and presenting a hazard to others.  Police officers told Rusfeldt to move—or, as defendants now characterize it, ordered him to disperse.  Rusfeldt was ultimately arrested.  The "Complaint/Information" for the violation of at least one of New York's disorderly conduct provisions (N.Y. Penal Law § 240.20(7)), which was affirmed by the officer on the date of the arrest, noted that Rusfeldt was "in possession of a large metal pole.  Defendant was asked to relinquish the pole and refused to do so."  (ECF 99-11 at 4.)  The charges were later dismissed without any court appearance.

The lawfulness of Rusfeldt's arrest does not turn on whether the individual officers loved or hated his message but on whether they had probable cause to arrest him and whether they would have arrested another person with a very different message under similar circumstances.

2

The fog of police action on June 27, 2021 is not sufficiently clarified by snippets of video, augmented by deposition testimony. Material issues of fact abound that preclude this Court from definitively opining on the lawfulness of police conduct. The Court will grant the defendants' summary judgment motion dismissing the Free Exercise claim (Second Claim) and Equal Protection claim (Fourth Claim). It will deny each side's summary judgment motion directed to the Due Process claim (Fifth Claim) without prejudice to renewal of each side's positions at trial. Material issues of fact preclude Hughes's qualified immunity claim at this juncture. Rusfeldt does not oppose the dismissal of the police commissioner, who is sued only in an official capacity. All other relief sought by either party will be denied.

BACKGROUND

For each side's motion for summary judgment, the Court construes the facts in a light most favorable to the non-movant. Many of the core facts are undisputed and the Court notes material disputes where they exist.[1]

Rusfeldt is a self-described Christian evangelist and the pastor of a church located in Philadelphia. (Pl. 56.1 (ECF 101) ¶ 1; Def. 56.1 Resp. (ECF 108) ¶ 1.) Rusfeldt regularly engages in street preaching in which he denounces "LGBTQ+ ways of life"; he asserts that he has a religious obligation to express this viewpoint, despite knowing that many people will take offense at the content of his preaching. (Pl. 56.1 ¶¶ 4-5; Def 56.1 Resp. ¶ 4.) Rusfeldt refers to this practice as "Confrontational Evangelism." (Def. 56.1 ¶ 100; Pl. 56.1 Resp. (ECF 114) ¶ 100.)

_____

[1] Citations to the parties' Rule 56.1 statements are intended to reflect the evidence cited in those statements.

On June 27, 2021, Rusfeldt attended PrideFest, a large street festival held in downtown Manhattan that celebrates the LGBTQ+ community.  (Pl. 56.1 ¶¶ 6, 8; Def 56.1 Resp. ¶¶ 6, 8.)  Rusfeldt asserts that he was motivated by his religious beliefs to attend PrideFest because it was an "ideal opportunity to protest and proselytize."  (Pl. 56.1 ¶ 7.)  Rusfeldt, his wife, and two other members of his church arrived in what they describe as "a central gathering place for PrideFest attendees," i.e., Washington Square Park, on the afternoon of June 27.  (Pl. 56.1 ¶¶ 8-9; Def 56.1 Resp. ¶¶ 8-9.)

The following sequence of events was recorded on video by Rusfeldt's wife, Mary.  The authenticity of the video is not disputed by the parties, though there are three distinct segments of video.  (Pl. 56.1 ¶¶ 10, 15; Def. 56.1 Resp. ¶¶ 10, 15.)  Rusfeldt asserts that he wanted to ensure his interactions with festivalgoers and police were recorded, based on his past experience with street preaching and his expectation that some attendees would disagree with his message and "might become hostile."  (Pl. 56.1 ¶¶ 10-13, 15; Def. 56.1 Resp. ¶¶ 10-13, 15.)  When Rusfeldt and his wife and companions arrived at Washington Square Park, there was a "festival environment" in the air, and many festivalgoers were playing music and wearing Pride-related attire and flags; some streets were blocked to vehicular traffic by metal barricades.  (Pl. 56.1 ¶¶ 17-19; Def. 56.1 Resp. ¶¶ 17-19.)

Rusfeldt and his companions stationed themselves on a street corner across from the Park and set up a sign with messages on it, and also removed their outer layers of clothing to reveal messages on their shirts.  (Pl. 56.1 ¶¶ 23-25.)  (See Video Part 1 (ECF 99-5) at 0:18-27.)  These "religious messages" were, among other things, "critical of LGBTQ+ ways of life."  (Pl. 56.1 ¶ 25; Def. 56.1 Resp. ¶ 25.)  The video shows that Rusfeldt's group was carrying a large banner on a metal pole that read, "Fags and Whores Burn in Hell."  (See Video Part 1 at 2:24;

ECF 99-10 at 1:14; see also ECF 47 at 3.)  The group's T-shirts also displayed messages critical of feminism.  (See, e.g., Video Part 1 at 2:22.)

Rusfeldt's companion then began to preach in a way that was also critical of LGBTQ+ ways of life.  (Pl. 56.1 ¶ 26; Def. 56.1 Resp. ¶ 26.)  The video captures the speech, which includes Rusfeldt's companion telling bystanders that they were "sick," "disgusting," and "going to hell."  (Video Part 1 at 4:30-35.)  Rusfeldt's companion used a bullhorn as he spoke. (Id. at 3:45.)

As Rusfeldt's companion preached, five NYPD officers were standing immediately across the street, observing Rusfeldt and his group.  (Pl. 56.1 ¶ 28; Def. 56.1 Resp. ¶ 28; Video Part 1 at 5:00, 13:15.)  As Rusfeldt's group continued to speak, a crowd formed around them, quickly growing to approximately 200 people.  (Pl. 56.1 ¶¶ 29-30; Def. 56.1 Resp. ¶¶ 29-30.)

The parties agree that the crowd "heckled, berated, and threatened" Rusfeldt and his group due to the content of and viewpoint expressed in their speech.  (Pl. 56.1 ¶ 31; Def. 56.1 Resp. ¶ 31.)  Defendants deny knowledge of the motivations of any individual member of the crowd and suggest that the crowd may also have been attracted by the police presence, but they accept that the crowd was hostile to the viewpoints expressed.  (Def. 56.1 Resp. ¶ 32; Pl. 56.1 ¶ 32.)  The crowd danced in front of Rusfeldt's group, cursed at them, made offensive gestures at them, and took pictures in front of them.  At least one protestor attempted to engage Rusfeldt in a debate about the Bible.  (Video Part 1 at 7:59-8:15.)  At one point, another protestor approached Rusfeldt's group and stated that, although he did not agree with Rusfeldt's message, he did approve of Rusfeldt staying there and exercising his right to free speech.  (Id. at 20:19-31.)  For at least 15 minutes, the NYPD officers located across the street from Rusfeldt's group continued

to stand across the street but did not take any action to control the crowd.  (Pl. 56.1 ¶ 35; Def. 56.1 Resp. ¶ 35; <u>see</u> Video Part 1 at 5:00, 13:15.)

After about 15 minutes, some of the crowd began to throw objects and liquids at Rusfeldt's group.  (Pl. 56.1 ¶ 36; Def. 56.1 Resp. ¶ 36; <u>see</u> Video Part 1 at 15:34, 15:58-16:05, 19:20.)  At this point, the NYPD officers who had been observing the scene pushed their way through the crowd to speak with Rusfeldt.  (Pl. 56.1 ¶ 37; Def. 56.1 Resp. ¶ 37; see Video Part 1 at 16:30.)

One of the officers, Officer Nicholas Pounds, told Rusfeldt to "shut it down" and directed him to move around the corner.  (Pl. 56.1 ¶ 38; Def. 56.1 Resp. ¶ 38.)  The video shows Pounds saying to Rusfeldt, "All right, shut it down.  Someone's gonna get hurt, so shut it down." (Video Part 1 at 16:50-52.)  Rusfeldt declined to move or to lower his sign, citing his First Amendment right to protest peacefully, and requested to speak with a higher-ranking member of the NYPD.  (Pl. 56.1 ¶ 40; Def. 56.1 Resp. ¶ 40; Video Part 1 at 17:15.)  Pounds replied, "I get it, I get it, but if there's a risk of somebody getting hurt, we gotta shut it down."  (Video Part 1 at 16:50-58.)  Another officer stated that the crowd was blocking the street.  (<u>Id.</u> at 17:00-03.) When Rusfeldt requested to speak to a lieutenant or sergeant, Pounds again said to Rusfeldt, "Shut it down.  And we'll go over there and we're gonna talk to you."  (<u>Id.</u> at 17:08-20.)  Pounds then continued, when Rusfeldt said he was not blocking the sidewalk, "It's not about blocking the sidewalk, it's about creating a dangerous situation."  (<u>Id.</u> at 17:30-34.)  Rusfeldt showed Pounds letters that he or his attorney had purportedly sent to a captain in that district, informing him of his plans to preach on that sidewalk in accordance with his First Amendment rights; Pounds replied, "I get it, I get it."  (<u>Id.</u> at 18:31-33.)

The NYPD officers contacted their superiors while standing between Rusfeldt and the crowd.  (Pl. 56.1 ¶ 41; Def. 56.1 Resp. ¶ 41.)  Sergeant Sean McDermott of the NYPD arrived about ten minutes later and informed Rusfeldt that the NYPD had "more resources" on the way.  (Pl. 56.1 ¶¶ 43-44; Def. 56.1 Resp. ¶¶ 43-44; Video Part 1 at 22:30-23:57.)  Rusfeldt explained to Sergeant McDermott that he planned to stay on the sidewalk and exercise his First Amendment rights and that he would not block the sidewalk, and McDermott replied, "That's fine."  (Video Part 1 at 22:57.)

As the crowd of Pride attendees continued to protest, one protestor waved, in the face of Rusfeldt and the police officers, rainbow streamers on a large wooden or metal pole; the officers did not take any action.  (Id. at 28:39-29:20.)  NYPD Captain Mark Turner then arrived.  (Id. at 31:32.)  When Rusfeldt asserted to Turner that his speech was protected by the First Amendment, Captain Turner replied that he was not going to "put [his] officers at risk for expression."  (Pl. 56.1 ¶ 49; Def. 56.1 Resp. ¶ 49; Video Part 1 at 32:38-40.)  Turner asked Rusfeldt repeatedly to leave the area; when Rusfeldt stated that he was expressing his First Amendment rights, Turner stated, "This is not the time or place."  (Video Part 1 at 31:53.)  He also pointed to the sign and said, although the audio is not perfectly audible, "That sign is—no."  (Id. at 32:16.)  Rusfeldt also stated that he planned to stay until dark to continue preaching.  (Id. at 32:50-54.)  When Turner stated there was a danger to his officers, Rusfeldt replied that the officers could leave and put up barricades between him and the crowd.  (Id. at 32:40-45.)

When asked again by Turner if he would leave, Rusfeldt stated that he was respectfully declining based on his First Amendment rights.  (Id. at 33:34-40; Pl. 56.1 ¶¶ 47-48; Def. 56.1 Resp. ¶¶ 47-48.)  NYPD then placed portable metal barricades between Rusfeldt and

the group, as well as stationing additional officers between them.  (Pl. 56.1 ¶ 45; Def. 56.1 Resp. ¶ 45; Video Part 2 (ECF 99-7) at 5:16-34.)

Turner then stated that he had talked to his "legal agents" and asked Rusfeldt and his group to move again, stating that they were causing an emergency situation; Turner said that if Rusfeldt did not move, he would get "[his] cops" to move them.  (Video Part 2 at 13:40-53.) Rusfeldt asked if he was under arrest and stated, "All my attorney needs is the word 'arrest.'" (Id. at 14:06-10.)  Another officer replied that Rusfeldt was not under arrest "right now" and was free to go, that he could still "protest," but just had to move somewhere else.  (Id. at 14:12-20.) Turner then accused Rusfeldt of causing a "ruckus" and said repeatedly, "It's you, it's you."  (Id. at 14:39-44.)  When Rusfeldt continued not to move and to ask about arrest, Turner said he would have his officers remove Rusfeldt, stating, "It's you that they're going to remove."  (Id. at 15:15-18.)  Rusfeldt said to one of his companions a few minutes later, "We might have to move a little bit, but it's all the same."  (Id. at 16:16-18.)  Several minutes later, Rusfeldt and his group displayed a new sign written with a Sharpie that one of his companions held up over his head; that sign was not displayed on a pole.  (Id. at 22:40-23:18.)

NYPD Legal Bureau officers had, by this point, arrived on the scene and are visible in the video speaking to other NYPD personnel.  (Id. at 25:50.)  Rusfeldt noted this, pointing out to his wife that the NYPD was "having a meeting over there" and that the NYPD was aware "we're not doing anything wrong."  (Id. at 29:22-36.)

Finally, another officer approached Rusfeldt's group and said, "You're being ordered to disperse from this corner," told them to gather their belongings, and stated that if they did not move from the corner, they would be arrested.  (Video Part 3 (ECF 99-8) at 0:01-15.)  At

8

this point, Assistant Chief Stephen Hughes arrived on the scene as well.  (Pl. 56.1 ¶ 50; Def. 56.1 Resp. ¶ 50.)

Hughes said to Rusfeldt, "Take the sign down."  (Video Part 3 at 1:07.)  Rusfeldt asked, "Is it illegal?"  (Id. at 1:09.)  Hughes replied, "Listen.  Take the sign down."  (Id. at 1:11.) Another officer added, "It's causing a problem."  (Id. at 1:20-24.)  Then, an officer who appeared to be from the NYPD Legal Bureau stepped forward and advised Rusfeldt that he could take the sign off the pole and continue to hold and display it, noting that "nobody's saying you can't hold the sign," but that walking around with the pole was causing a dangerous condition.  (Id. at 1:33-2:00.)  The Legal Bureau officer asked Rusfeldt just to collapse the metal pole and said, "It's not . . . the speech," pointing to the sign itself.  (Id. at 2:00.)  Rusfeldt agreed to collapse the foldable metal pole and started to do so.  (Id. at 2:00-30.)

Rusfeldt then said to his group, "It looks like the crowd's that way.  To go away from the crowd, we can go that way," and began to walk along the street, away from the crowd that had gathered on the street corner toward the comparatively emptier Washington Place.  (Id. at 2:35-38.)  Hughes told them to walk toward Broadway and to make a right at the next corner. (Id. at 3:00-11.)  As they walked away, guided by NYPD officers, Hughes said to another officer, "Call me if he puts up the sign again and creates a disturbance."  (Id. at 3:18.)  After calling out to the officers that, if any officer arrested him, the officer would get a "permanent mark" on their record for violating his civil rights, Rusfeldt stopped a little more than halfway down the street.  (Id. at 4:00-10.)  Around this time, Officer Pounds's body-worn camera began to capture the events as well.  (ECF 99-10.)  An officer took out handcuffs at one point, saying, "We gave you a chance, bro, turn around," but then, instead of arresting Rusfeldt or taking his sign, continued to instruct him and his group to walk. (Video Part 3 at 6:09-30; ECF 99-10 at

2:53-3:15.) Eventually, Rusfeldt and his group reached the corner of Washington Place and stepped off the main road. (Video Part 3 at 7:00; ECF 99-10 at 3:40.)

Once they were on Washington Place, Hughes said to Rusfeldt, "You're antagonizing these people," and told him that the crowd would attack him and that Hughes's officers, who had families of their own, would get hurt in protecting him, which the NYPD was "unfortunately" required to do. (Video Part 3 at 7:15; ECF 99-10 at 3:45; Pl. 56.1 ¶ 59; Def. 56.1 Resp. ¶ 59.) Rusfeldt replied, "Unfortunately? That's a good law." (ECF 99-10 at 3:50.) Hughes said, "Listen, we gave you an opportunity to leave before, I'm not giving it to you again." (Video Part 3 at 7:28-31; ECF 99-10 at 4:15.) As Rusfeldt continued to speak with Hughes, stating that he was just "walking down the street," Hughes turned to Rusfeldt's wife, who was still filming, and said, "Look at the sign. Show his sign. Aim [the camera] up at the sign." (Video Part 3 at 7:40-44; ECF 99-10 at 4:21-29.) Notably, the metal pole holding up the sign had been at least partially collapsed at this point, although Rusfeldt was still holding it up. (Video Part 3 at 7:44; ECF 99-10 at 3:56.) Hughes then asserted that under New York law, he had the ability to order a "group of three or more" to disperse. (Video Part 3 at 8:07-15.) Hughes also ordered Pounds to film the crowd in order to document the dangerous condition of the hostile crowd, which is documented in Pounds's body-worn camera footage. (Pl. 56.1 ¶¶ 60-61; Def 56.1 Resp. ¶¶ 60-61; ECF 99-10 at 5:50-6:30.)

As Pounds filmed the crowd, Hughes stated to him and another officer: "Tell them to disperse again so they have it . . . . Tell them to disperse. Don't say anything else. Just disperse." (ECF 99-10 at 6:28-37.) The other officer stepped forward and said to Rusfeldt's group: "One last chance. You're ordered to disperse." Pounds then added, "Please disperse, leave the area, please. Please leave the area." (Video Part 3 at 9:54-10:03; ECF 99-10 at 6:41-

47.)  The officers then arrested Rusfeldt and his companions.  (Video Part 3 at 10:10-30; ECF 99-10 at 7:00-30.)  The crowd cheered when Rusfeldt was arrested.  (Video Part 3 at 10:10-30; Pl. 56.1 ¶ 66; Def. 56.1 Resp. ¶ 66.)  Rusfeldt handed the sign to one of his companions as he was arrested; the companion began disassembling the sign, but officers instructed him to put the sign down so they could arrest him.  The companion replied, "I'm taking [the sign] down for you guys. . . . Wait, I'm arrested for complying? . . . I am leaving."  (Video Part 3 at 10:22-33; ECF 99-10 at 7:07-18.)  Another officer instructed the companion, "Take the sign apart right now and leave the area," but shortly thereafter, all three of Rusfeldt's companions were arrested.  (Video Part 3 at 10:45-11:20; ECF 99-10 at 7:32-7:48.)

Rusfeldt was transported to a booking facility after his arrest, where he was held in custody for approximately two and a half hours before he was released.  (Def. 56.1 ¶ 101; Pl. 56.1 Resp. ¶ 101.)  Rusfeldt was issued summonses for Disorderly Conduct under N.Y. Penal Law § 240.2(6) & (7).  (Def. 56.1 ¶ 102; Pl. 56.1 Resp. ¶ 102.)  See also N.Y. Penal Law § 240.2(6) & (7) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or 7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.").  Those summonses were eventually dismissed against Rusfeldt and his companions.  (Def. 56.1 ¶ 102; Pl. 56.1 Resp. ¶ 102.)

It is undisputed that no members of the crowd of Pride attendees were arrested, that no NYPD officer used a bullhorn to give a dispersal order during the event, and that the NYPD did not direct any law enforcement resources toward dispersing the crowd of Pride attendees, although dozens of officers were present on the scene, other than some officers telling

11

individuals to "move along" occasionally.  (Pl. 56.1 ¶¶ 77-79; Def. 56.1 Resp. ¶¶ 77-79.)

Defendants do not dispute that they had dozens of officers on scene throughout the incident but

assert that they did assist in dispersing the crowd "insofar as they participated in the arrest and

removal of Plaintiff and his group, who were recklessly causing the crowd to form and remain."

(Def. 56.1 Resp. ¶ 80.)

Rusfeldt also attended the Pride March in New York in 2022 and 2023,

communicated his intention to do so to the City's counsel in advance, and was not arrested at

those events.  (Pl. 56.1 ¶¶ 82-83; Def. 56.1 Resp. ¶¶ 82-83.)  Rusfeldt states that he plans to

attend future Pride events to continue his preaching and that he reasonably fears that the City will

again stop him from speaking and arrest him.  (Pl. 56.1 ¶¶ 85-87.)

PROCEDURAL HISTORY

Rusfeldt filed his complaint on January 21, 2022.  (ECF 1.)  On March 7, 2022,

Rusfeldt moved for a preliminary injunction, seeking to enjoin defendants from preventing him

from engaging in speech criticizing LGBTQ+ ways of life during the 2022 Pride March.  (ECF

17.)  After granting several requests to extend time to respond to this motion, the Court held a

hearing and denied Rusfeldt's motion for a preliminary injunction, concluding that Rusfeldt had

not demonstrated a likelihood of irreparable harm; the Court did not reach the issue of his

likelihood of success on the merits.  (ECF 47 at 7.)  The Court also denied Rusfeldt's June 24,

2022 letter seeking reconsideration of that decision.  (ECF 45, 48.)

On March 20, 2023, Rusfeldt submitted his First Amended Complaint (ECF 83).

Rusfeldt also served a notice of Constitutional Question pursuant to Rule 5.1, Fed. R. Civ. P.,

and Request for Certification pursuant to 28 U.S.C. § 2403 on the New York State Attorney

General.  (ECF 87.)  The Court certified this challenge to the New York State Attorney General and also extended the time for the Attorney General to intervene.  (ECF 96.)  The Attorney General's office then informed the Court that it did not elect to intervene at that time, requesting that no adverse inference be drawn to the State from that decision.  (ECF 97.)

Rusfeldt thereafter moved for summary judgment.  (ECF 98.)  Defendants cross-moved for summary judgment on December 21, 2023.  (ECF 107.)[2]

LEGAL STANDARD

On a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  In the case where both parties have moved for summary judgment, "a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted).  "Even where both parties have moved for summary judgment, 'neither motion may be granted unless one party is entitled to it as a matter of law upon genuinely undisputed facts.'"  Safeway Environmental Corporation v. American Safety Insurance Company, 2010 WL 331693, at *2 (S.D.N.Y. Jan. 28, 2010) (Pauley, J.) (quoting Rhoads v. McFerran, 517 F.2d 66, 67–68 (2d Cir. 1975) (per curiam)) (citations omitted). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Williams v. New York City Housing Authority,

---

[2] On April 22, 2024, Rusfeldt filed a notice of supplemental authority, informing the Court of a recent Ninth Circuit decision, Meinecke v. City of Seattle, 99 F.4th 514, 518 (9th Cir. 2024). (ECF 116.)

572 F. App'x 23, 24 (2d Cir. 2014) (summary order) (quoting <u>Matsushita Electric Industrial Co.,</u>
<u>Ltd. v. Zenith Radio Corporation</u>, 475 U.S. 574, 587 (1986)).


<u>DISCUSSION</u>

    Rusfeldt asserts five claims: (1) violation of his right to freedom of speech under
the First Amendment; (2) violation of his right to free exercise of religion under the First
Amendment; (3) violation of his right to be protected from unreasonable seizure under the Fourth
Amendment; (4) violation of his right to equal protection under the Fourteenth Amendment; and
(5) violation of his right to due process under the Fourteenth Amendment.  He also seeks, in his
prayer for relief, a preliminary and permanent injunction against defendants' "heckler's veto
practices" and a declaration that N.Y. Penal Law § 240.20 is unconstitutionally vague and
overbroad, both facially and as applied to the facts of this case.  (ECF 83 at 15-23.)  Rusfeldt
moves for summary judgment on all of his claims, and defendants cross-move for summary
judgment in their favor.


I.  <u>Rusfeldt's First Amendment Speech Claim Arising From His Arrest.</u>

    "The First Amendment provides that 'Congress shall make no law . . . abridging
the freedom of speech.'  In general, we have held that the First Amendment prohibits the
Government from restricting or burdening 'expression because of its message, its ideas, its
subject matter, or its content.'"  <u>Vidal v. Elster</u>, 602 U.S. 286, 292 (2024) (citation omitted).

    To decide whether a restriction, if any, on speech violates the First Amendment,
courts must first determine whether the speech is the type of speech "protected by the First

Amendment, for, if it is not, we need go no further." Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 797 (1985).

Here, the parties agree—and the Court concludes—that Rusfeldt's speech took place in a public forum—a public sidewalk of the City of New York, which is a traditional public forum. (Pl. 56.1 ¶ 89; Def. 56.1 Resp. ¶ 89.) The parties dispute whether Rusfeldt's speech is protected.

While "[t]he scope of permitted expression [under the First Amendment] is broad," insulting language "must be tolerated" unless those insults contain "threats of coercion that intimidate [or] fighting words that create the possibility of imminent violence." Rupp v. Buffalo, 91 F.4th 623, 634 (2d Cir. 2024) (quoting X-Men Security, Inc. v. Pataki, 196 F.3d 56, 68-69 (2d Cir. 1999), itself citing Chaplinsky v. New Hampshire, 315 U.S. 568 (1942)).

Defendants assert that the words used by Rusfeldt on a large sign held aloft on a pole, "Fags and Whores Burn in Hell," were intended by Rusfeldt "to shock and upset his target audience: members of the LGBTQ+ community. In that context his sign was fighting words unworthy of protection under the First Amendment." (ECF 109 at 32; footnote omitted.)

Defendants' position is profoundly wrong. Obnoxious and loathsome speech is protected under the First Amendment. Snyder v. Phelps, 562 U.S. 443, 458 (2011) (citation omitted) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); see also National Socialist Party of America v. Village of Skokie, 432 U.S. 43, 43–44 (1977) (per curiam) (vacating order enjoining "displaying any materials which incite or promote hatred against persons of Jewish faith"); Brown v. State of Louisiana, 383 U.S. 131, 133 n.1 (1966) (citations omitted) ("Participants in an orderly

demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence.").[3]  The Court accepts that the message communicated by Rusfeldt was "shock[ing] and upset[ing]," but his words are not fighting words because, in context, they were not "inherently likely to provoke violent reaction."  Cohen v. California, 403 U.S. 15, 20 (1971) (citation omitted).[4]

Rusfeldt also asserts that the defendants violated his right to free expression under the First Amendment because they failed to intervene with the crowd of Pride festivalgoers until members of the crowd began throwing objects at him.  (ECF 99 at 11-13.)  Here, the record— including the video—demonstrates beyond dispute that the NYPD officers who were observing the crowd of Pride attendees from across the street did intervene as soon as one or more members of the group began throwing objects at Rusfeldt's group.  (Video Part 1, 0:00-16:30.) At this point, at least five officers stationed themselves between Rusfeldt and the crowd of Pride attendees, and they also later placed metal barricades between Rusfeldt and the crowd.

Defendants' depositions also reiterate their understanding that they, in fact, could not intervene against the crowd until there was violence by a member of the crowd.  (See, e.g., ECF 99-3, Hughes Deposition at Tr. 188.)  See Musso v. Hourigan, 836 F.2d 736, 743 (2d Cir. 1988) ("We do not believe . . . that Mazzafero's alleged failure to prevent Millar from violating Musso's [F]irst [A]mendment rights transgressed any clearly established legal norm.  As a general rule, a government official is not liable for failing to prevent another from violating a

---

[3] The Court in Brown cited to an article describing the phenomenon as a "heckler's veto," a term Rusfeldt uses frequently in his briefing.  Id. (citing Kalven, The Negro and the First Amendment, pp. 140-60 (1965)).

[4] Rusfeldt correctly points out that defendants initially admitted that his expressive activities were protected speech in a Response to a Request for Admission (ECF 113 at 3-4; ECF 99-12 at 3) and should not be permitted to withdraw the admission.  As an alternate ground, the Court agrees that the change of position would unfairly prejudice Rusfeldt, and defendants' request to be relieved of the admission is denied.  Rule 36(b), Fed. R. Civ. P.

person's constitutional rights, unless the official is charged with an affirmative duty to act.").
The Court concludes that defendants' actions in not intervening before the crowd became
"unruly" does not constitute a restriction on Rusfeldt's speech—especially because Rusfeldt and
his group continued to speak even after the objects were thrown.

　　　　　The action of NYPD officers in placing physical barricades between Rusfeldt's
group and the crowd of Pride attendees, allowing the messages of each side to be heard or seen,
was a reasonable response not based on the content or viewpoint of opposing messages.  Perhaps
NYPD officers could have ordered the crowd of Pride attendees to disperse, but so long as the
decision not to do so was free of discrimination in favor of the crowd's viewpoint or against
Rusfeldt's, they were free to make this decision.  The NYPD officers were prohibited from
infringing the speech rights of Rusfeldt or the Pride attendees and, from the summary judgment
record, the placement of the barricades was the least restrictive means available to police officers
to maintain order and allow speech to be heard.  Their decision not to take other more aggressive
actions against the Pride festivalgoers did not preclude NYPD officers from taking action against
Rusfeldt if it was otherwise warranted.

　　　　　Rusfeldt mounts a First Amendment challenge to his arrest.  It stands or falls
principally on whether there was probable cause for his arrest.  The Supreme Court has
considered "whether probable cause to make an arrest defeats a claim that the arrest was in
retaliation for speech protected by the First Amendment."  Nieves v. Bartlett, 587 U.S. 391, 397–
98 (2019).  The Court concluded that the existence of probable cause defeated the claim.  Id. at
408.  The Court noted one possible exception to the rule: "Although probable cause should
generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances

17

where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Id. at 406.

This Court concludes that the rule in Nieves applies here. Like the plaintiff in Nieves, Rusfeldt's action is brought under section 1983 and alleges that the defendants arrested him in retaliation for protected speech. (See ECF 83 ¶ 78 ("Defendants acted with a retaliatory intent or motive. . . .").) While there are distinctions between an arrest made in retaliation for protected expression in the workplace versus the street, the observations of the Nieves Court are directly relevant to both: "Police officers conduct approximately 29,000 arrests every day—a dangerous task that requires making quick decisions in 'circumstances that are tense, uncertain, and rapidly evolving.' . . . To ensure that officers may go about their work without undue apprehension of being sued, we generally review their conduct under objective standards of reasonableness." 587 U.S. at 403 (citations omitted).

Rusfeldt makes no effort to show that NYPD officers typically do not make arrests in similar circumstances when the participants are not engaged in expressive activity or when they are expressing a favored viewpoint. Rusfeldt's effort to draw a close analogy to police inaction in response to the conduct of the Pride crowd of festivalgoers fails. The police were across the street when objects were thrown in the direction of Rusfeldt, and the record does not permit the conclusion that the police had the ability to identify and arrest the offender or offenders. It was only Rusfeldt, and not any of the festivalgoers, who was on the sidewalk holding aloft a long metal pole supporting a banner, a pole which arguably presented a hazard to those in proximity to it. No reasonable factfinder could conclude that the waving of a rainbow flag by one Pride festivalgoer seen on a video presented a hazardous or physically offensive condition.

18

Rusfeldt asserts that as a matter of law there was no probable cause for his arrest. (ECF 83 ¶ 81; ECF 99 at 14-18.)  Defendants assert that as a matter of law there was probable cause for his arrest.  (ECF 109 at 17-21.)  The Court concludes that there are material issues of fact that preclude summary judgment.

The principal statute relied upon by the parties with respect to their probable cause arguments is N.Y. Penal Law § 240.20, which provides, in pertinent part, as follows:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof: . . .
>
> > [(6)] He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
> >
> > [(7)] He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose. . . .[5]

A. Material Issues of Fact on the Issue of Probable Cause for a Violation of N.Y. Penal Law §240.20(6).

There are four elements necessary to establish probable cause to support an arrest under N.Y. Penal Law § 240.20(6): "(1) defendant congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted 'with intent to cause public inconvenience, annoyance or alarm' or with recklessness to the 'risk thereof.'"  United States v. Nelson, 10-CR-414 (PKC), 2011 WL

---

[5] The Court finds that the other two provisions cited by the parties would not support summary judgment in favor of defendants.  N.Y. Penal Law § 240.10 prohibits "unlawful assembly": "A person is guilty of unlawful assembly when he assembles with four or more other persons for the purpose of engaging or preparing to engage with them in tumultuous and violent conduct likely to cause public alarm, or when, being present at an assembly which either has or develops such purpose, he remains there with intent to advance that purpose."  Rusfeldt and his group, however, only totaled four persons.  There is also a dispute as to whether the officers had probable cause to arrest Rusfeldt for violating N.Y. Penal Law § 195.05, which prohibits "intentionally obstruct[ing], impair[ing] or pervert[ing] the administration of law or other governmental function or prevent[] or attempt[] to prevent a public servant from performing an official function, by means of . . . physical force or interference."  Defendants assert that Rusfeldt's refusal to comply with their orders constitutes a violation of this statute as well.  (ECF 109 at 20.)  But for the reasons discussed, there is a genuine dispute as to which order, if any, amounted to a clear dispersal order.

1327332, at *3 (S.D.N.Y. Mar. 31, 2011), affirmed, 500 F. App'x 90 (2d Cir. 2012) (summary order); cf. Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001).

Rusfeldt does not dispute that the NYPD gave him orders to leave the area, that he understood these orders, and that he did not comply with them. (Def. 56.1 ¶ 103; Pl. 56.1 Resp. ¶ 103.) He also does not dispute that the NYPD officers were motivated by a desire to control or maintain the public order "that was either disrupted or threatened to be disrupted by the crowd that gathered around" him when they issued these orders. (Def. 56.1 ¶ 106; Pl. 56.1 Resp. ¶ 106.) Rusfeldt argues, however, that these orders were not "orders to disperse," as the term is used in N.Y. Penal Law § 240.20(6), and that they were also unlawful orders. (Def. 56.1 ¶¶ 104, 106; Pl. 56.1 Resp. ¶¶ 104, 106.)

An order by police for an individual to disperse or leave an area while exercising his right to free speech is a restriction on that speech. See Kass v. City of New York, 864 F.3d 200, 207-08 (2d Cir. 2017). Because Rusfeldt was ordered to disperse under a New York statute and that order restricted his speech, the Court must determine both whether the order was "lawful" under New York law and whether it satisfied the requisite Supreme Court standard for a restriction of Rusfeldt's constitutional rights under the First Amendment. See id. (citations omitted) ("The First Amendment, however, 'does not guarantee the right to communicate . . . at all times and places or in any manner that may be desired.' . . . At issue here is the balance between an individual's First Amendment right to engage in a conversation on a public sidewalk with protestors and the government's interest in maintaining public safety and order."); Jones v. Parmley, 465 F.3d 46, 60 (2d Cir. 2006) ("Plaintiffs' facts, as alleged, would also give rise to a separate First Amendment violation even if the NYSP had a lawful basis to interfere with the demonstration.").

The purported orders to disperse were not "arbitrary" and therefore were lawful under New York law.  See Meyers v. City of New York, 812 F. App'x 11, 14 (2d Cir. 2020) (summary order) (citations omitted) ("[W]e conclude that the dispersal order was lawful because it was intended to promote several legitimate governmental goals and was therefore not arbitrary. The City had a legitimate interest in ensuring that the Park remained accessible to all members of the public—not just the protestors—and free of congestion.").

The disorderly conduct statute is content and viewpoint neutral.  There is no evidence that officers who have probable cause to make arrests under section 6 of N.Y. Penal Law § 240.20 "typically exercise their discretion not to" arrest persons under similar circumstances.  Nieves, 587 U.S. at 406.  There is also no evidence that any officer was motivated by antipathy towards Rusfeldt's views.  There are several instances in the video where NYPD personnel are heard to state to Rusfeldt that they were respecting his First Amendment rights and that their orders to disperse were not based on the content of his sign or his other speech.  (See, e.g., Video Part 3 at 1:33-2:00 (an NYPD official telling Rusfeldt to collapse the metal pole but allowing him to continue to display the sign, saying, "It's not . . . the speech."); Video Part 1 at 18:31-33 (Pounds saying "I get it, I get it" when Rusfeldt stated he was exercising his right to free speech).)

Defendants concede that "the crowd was hostile to the viewpoints expressed by [Rusfeldt] and his group," although they also suggest that the crowd was drawn by the police presence that formed.  (Def. 56.1 Resp. ¶ 32.)  But defendants also dispute that they took action against Rusfeldt to leave because of the hostility of the crowd, citing Hughes's testimony that it was based on the "totality of the circumstances."  (Def. 56.1 Resp. ¶ 52.)

The parties do not dispute, and the video shows, that several officers, over the course of an hour, gave Rusfeldt "orders" or directives to leave the area—at times saying "order to disperse" and at times using other language. The first purported order to disperse occurred when, after NYPD officers crossed the street and spoke to Rusfeldt, Officer Pounds said to Rusfeldt, "Shut it down." (Video Part 1 at 16:50-52.) The parties dispute what Pounds meant by this—whether, for example, Pounds wanted Rusfeldt to stop speaking, or stop speaking and lower his sign, or to stop speaking in that particular location. (Pl. 56.1 ¶ 39; Def. 56.1 Resp. ¶ 39.)

Rusfeldt testified at deposition that he interpreted Pounds' directive to "shut it down" as an order to stop speaking or he would be arrested. (ECF 99-2 at Tr. 105-06.) But Pounds himself, however, at first testified that he did not recall if his initial comment to "shut it down" was an order to disperse and felt that Rusfeldt was only violating the statute once he refused to obey the order given to him once Pounds's supervisors arrived on the scene. (See ECF 99-9 at Tr. 26.)

Pounds was less than definitive that, when he told Rusfeldt to "shut it down" and suggested that they "go over there and talk about it," it was an order to leave the area. (Id. at Tr. 25 ("Q. You didn't tell him to leave the area at this point, did you? You just told him to shut it down and said, 'Let's go over there and talk about it.' A. If that's what the video shows, yes.").) Pounds also acknowledged that Hughes later ordered him to order Rusfeldt to leave the area, after which he gave such an order. (See id. at Tr. 42.)

Chief Hughes first testified at deposition that Rusfeldt was "subsequently arrested" for his refusal to obey Pounds's directive when he first arrived on the scene and told him to "shut it down." (ECF 99-3 at Tr. 152-54.) But Hughes ultimately testified that there was

uncertainty around which directive from the NYPD officers was the order to disperse that Rusfeldt disobeyed because it was all part of the "whole incident." (See id. at Tr. 241-42.)

Hughes also testified about his interaction with Rusfeldt once he arrived on the scene, when he told Rusfeldt to keep walking toward Broadway: "[T]he officers gave an order to disperse. I wanted to make sure he knew what disperse meant, and it meant making a turn and going two blocks down toward Broadway. That would be dispersal. I gave him clear instruction on how to disperse." (Id. at Tr. 197.) Hughes's instructions to Rusfeldt to proceed toward Broadway could therefore also be considered an "order to disperse." But Hughes then testified, referring to the various orders given to Rusfeldt over the space of the hour, "[Y]ou could add all those other ones, we're trying to give him a break. But no, it goes back to the first one. You want to—the first one or the 50th one at this point. But it's basically based on the first one, the whole crowd to get the crowd to disperse. He wasn't dispersing. . . . They could have gave it on any of those 50 directions. . . . I told the pastor, I said, 'You're getting arrested for the incident that happened around the corner.'" (See id. at Tr. 242-43.)

Finally, Captain Mark Turner testified that when he arrived on the scene, he also "asked" Rusfeldt to leave the location, which could also be construed as an order to disperse. (See ECF 99-4 at Tr. 26.) This testimony reveals an ambiguity about whether Turner himself gave an order or if he believed that he had only "asked" Rusfeldt and his group to move but later enforced Hughes's order for the group to head toward Broadway. But Hughes, in his testimony, was under the impression that Turner had also given an order to disperse. (ECF 99-3 at Tr. 241-42.)

The Court need not recount every fact of record demonstrating a genuine dispute over the dispersal order. Because there are serious questions of which order, if any, amounted to

a clear dispersal order, there is a material issue of fact as to whether there was probable cause for the arrest under section 240.20(6). The Court will allow the issue to be presented to the jury.

### B. Material Issues of Fact on the Issue of Probable Cause for a Violation of N.Y. Penal Law § 240.20(7).

The Court also concludes that there is a genuine issue of material fact as to whether there was probable cause to arrest Rusfeldt for violating subsection (7) of N.Y. Penal Law § 240.20 by either blocking traffic or carrying a pole. As noted, a person is guilty of a violation of this provision when he "creates a hazardous or physically offensive condition by any act which serves no legitimate purpose. . . ." and "with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof. . . ."

Defendants argue that they had probable cause to arrest Rusfeldt for violating this subsection of the statute because he was "creat[ing] a hazardous or physically offensive condition by any act which serves no legitimate purpose." Defendants cite two reasons for this violation: (1) because the crowd around Rusfeldt was creating a traffic hazard, and (2) because Rusfeldt's sign was on a large metal pole that was unsafe.[6]

Many of the officers on scene, including Turner, stated that Rusfeldt was causing a dangerous condition by blocking the sidewalk. (See, e.g., ECF 99-4 at Tr. 25-26.) Rusfeldt himself testified that his own group was not blocking the sidewalk, which he understood was illegal. (ECF 99-2 at Tr. 33.) Several vehicles are seen driving past the crowds on the video, despite the barriers placed on Washington Square East, and Hughes testified the road was not "formally closed," but was "traffic restricted" at that point. (ECF 99-3 at Tr. 122-23.)

---

[6] In addition, Chief Hughes also stated that plaintiff did not have a "sound permit" for the bullhorn his companion was using to preach but conceded that the use of the bullhorn did not "form any basis for the plaintiff's arrest." (ECF 99-3 at Tr. 247-48.)

There is also a genuine issue of material fact as to whether Rusfeldt's actions in creating a hazardous condition served a "legitimate purpose." Rusfeldt asserts that his actions were legitimate because he was exercising his right to free speech, which Defendants dispute. (ECF 99 at 16-17.)

Because there are genuine disputes over the facts that officers relied on to demonstrate probable cause, the Court will allow that question to be submitted to the jury. See Dufort v. City of New York, 874 F.3d 338, 348 (2d Cir. 2017) (citations omitted) ("Probable cause is a mixed question of law and fact. Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury. However, 'where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.'").

II.     Rusfeldt's Facial Challenges to N.Y. Penal Law § 240.20 (6) & (7) Fail,
        and His As-Applied Challenge Must Await Further Factual Development.

Rusfeldt challenges the facial constitutionality of N.Y. Penal Law § 240.20(6) & (7) as overbroad and vague. The argument is developed in two-and-one-half pages of briefing in Rusfeldt's opening memorandum and about one page in defendants' response. (ECF 99 at 21-23; ECF 109 at 25-26.)

"The elements of First Amendment overbreadth analysis are familiar. Only a statute that is substantially overbroad may be invalidated on its face. . . . 'We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application. . . .' Instead, '[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" City of Houston v. Hill, 482 U.S.

451, 458–59 (1987) (citations omitted).  The substantiality is to be judged "in relation to the

statute's plainly legitimate sweep."  United States v. Stevens, 559 U.S. 460, 473 (2010) (quoting

Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 n.6 (2008)).

"A statute can be impermissibly vague for either of two independent reasons.

First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand

what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and

discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000).  "Where a statute's

literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression

sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in

other contexts."  Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006) (quoting Smith v. Goguen,

415 U.S. 566, 573 (1974)).

Here, subdivision 6 of section 240.20 requires proof of an "intent to cause public

inconvenience, annoyance, or alarm, or recklessly creating a risk thereof," "congregat[ing] with

other persons in a public place," and a refusal "to comply with a lawful order of the police to

disperse."  Similarly, subdivision 7 contains the same elements, but in lieu of the disobedience to

a dispersal order, it requires proof of the creation of "a hazardous or physically offensive

condition by any act which serves no legitimate purpose. . . ."

Neither subdivision, by its express terms, reaches nor excludes speech or other

expressive activities.  Both subdivisions 6 and 7 could be read to reach speech that is merely an

"annoyance" to others.  The parties have failed to address whether there has been any "narrowing

state court interpretation" that should be into taken account in addressing the purported

vagueness and overbreadth of the statute.  Citation to a case upholding the constitutionality of a

similarly worded statute while disclaiming an intent to limit the reach of that statute is not quite

the same thing.  People v. Tichenor, 89 N.Y.2d 769, 772–76 (1997).  Of course, the statute

would still require satisfaction of the intent element, congregating with other persons, and either

the refusal to comply with a dispersal order or the creation of a hazardous or physically offensive

condition.

The Court denies Rusfeldt's facial challenge to the two statutes on this record

without prejudice to renewal after trial.  The challenges to the statutes as applied also must await

trial and a record that clarifies Rusfeldt's own conduct and that of the officers.


III.        Rusfeldt's First Amendment Free Exercise of Religion Claim.

Rusfeldt's First Amendment free exercise of religion claim occupies one

paragraph of his moving memorandum of law.  (ECF 99 at 23-24.)  "To prevail on his Free

Exercise claim, [plaintiff] must first show that a state action sufficiently burdened his exercise of

religion. . . . Once a plaintiff demonstrated that his free exercise rights were substantially

burdened by state action, courts traditionally upheld the state action only if it was justified by a

compelling state interest."  Genas v. State of N.Y. Department of Corrections Services, 75 F.3d

825, 831 (2d Cir. 1996).

"It is not a violation of the Free Exercise Clause to enforce a generally applicable

rule, policy, or statute that burdens a religious practice, provided the burden is not the object of

the law but merely the 'incidental effect' of an otherwise valid neutral provision."  Seabrook v.

City of New York, 210 F.3d 355 (2d Cir. 2000) (summary order) (citation omitted); Agudath

Israel of America v. Cuomo, 980 F.3d 222, 226 (2d Cir. 2020) (per curiam) (citation omitted).

Courts have "repeatedly refused to find free exercise violations where the laws or rules at issue

'do not bar any particular religious practice,' . . . or where the plaintiff does not even allege that

the rule targets or was motivated to prohibit certain religious beliefs. . . ." <u>Seabrook</u>, 210 F.3d

355 (citations omitted).

New York's disorderly conduct statute is a neutral provision that does not by its

terms impose any burden on a particular religious practice or target any religious beliefs. The

Court accepts as true that there was a religious component to Rusfeldt's speech—or street

preaching—motivated by a desire to convey a Christian evangelical message. But no action or

inaction of defendants is attributed to the religious aspect of his message. There is nothing in the

summary judgment record beyond the legal labels in Rusfeldt's First Amended Complaint and

his memorandum of law to support a claim. (ECF 83 ¶¶ 81-86; ECF 99 at 23-24.)

The Court will grant summary judgment to the defendants on Rusfeldt's First

Amendment Free Exercise claim.

IV.    <u>The Fourth Amendment Claim Turns on the Disputed Question of Probable Cause.</u>

Rusfeldt also asserts that his arrest violated his Fourth Amendment right to be free

from seizures of the person. The existence of probable cause for an arrest defeats a Fourth

Amendment claim as well. <u>Marcavage v. City of New York</u>, 689 F.3d 98, 109–10 (2d Cir. 2012)

(citations omitted) ("A Fourth Amendment claim turns on whether probable cause existed to

arrest for any crime, not whether probable cause existed with respect to each individual charge.

Accordingly, Defendants prevail if there was probable cause to arrest Plaintiffs for any single

offense."). The disputed issues of fact relating to the existence of probable cause preclude the

grant of relief to either side.

V.    Rusfeldt's Equal Protection Claim.

Rusfeldt asserts an equal protection "class-of-one" type claim, asserting that he was singled out for selective enforcement of a criminal statute based upon his speech and religion, noting specifically that none of the Pride festivalgoers were arrested that day.  (ECF 83 ¶¶ 90-91.)  "To proceed under a selective enforcement theory, Plaintiffs must plausibly allege that any selective treatment they experienced 'was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [them].'"  Lilakos v. New York City, 808 F. App'x 4, 8 (2d Cir. 2020) (summary order) (quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)).  Rusfeldt need not show malice, but he must show that "there is no rational basis for the difference in treatment. . . . "  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (citations omitted); Lilakos, 808 F. App'x at 8.

In addition, plaintiffs must show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted).  "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that '(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.'"  Id. (citation omitted).

Rusfeldt's claim fails because there is not a high degree of similarity between his circumstance and that of the Pride festivalgoers in the crowd who expressed hostility to his message.  First, there is no showing that those members of the crowd who threw objects or

liquids could have been identified by law enforcement and apprehended for the crime of assault. The police moved into position only after viewing the scene of objects being thrown from a distance. Nor is there any factual showing by plaintiff that any member of the crowd of Pride attendees was disobeying a lawful order to disperse,[7] blocking a sidewalk, or carrying a large metal pole.[8]

The Court will grant summary judgment to defendants on Rusfeldt's equal protection claim.

VI.    The Qualified Immunity Defense of Hughes Must Await Further Factual Development.

Assistant Chief Hughes was not on the scene for most of the events at issue in this action. He arrived on the scene after it had been unfolding for about an hour. (Pl. 56.1 ¶ 50; Def. 56.1 Resp. ¶ 50.) The undisputed evidence is that, prior to making the arrest, Hughes consulted with the NYPD Legal Bureau for the purpose of seeking legal advice. (Pl. 56.1 Resp. ¶ 105; Def. 56.1 ¶ 105.) He argues that he is entitled to qualified immunity.

"[I]t is not necessary for a district court to determine whether in fact the First Amendment was violated before deciding whether a defendant is entitled to qualified immunity. . . . [T]he whole point of the qualified immunity defense is to allow a defendant to be dismissed out of the case even if a right was actually violated (i.e., where it can be shown that the right asserted was not clearly established at the time, or that if the right was clearly established, it was objectively reasonable for the defendant to believe he or she was not violating it)."  McCullough

---

[7] Plaintiff asserts there was no dispersal order issued to the crowd of Pride attendees. Defendants admit that they did not give an official dispersal order to the crowd, for example via bullhorn; instead, they assert that they did direct NYPD resources toward moving the crowd along, including by arresting Rusfeldt and potentially telling other individuals in the crowd to continue moving. (See Def. 56.1 Resp. ¶¶ 76-80; Pl. 56.1 ¶¶ 76-80.)

[8] As noted, one Pride festivalgoer is seen in a video waving a rainbow flag, but no reasonable factfinder could conclude that it presented a hazardous or physically offensive condition.

v. Wyandanch Union Free School District, 187 F.3d 272, 277 (2d Cir. 1999). "In the context of false arrest . . . claims, an officer is entitled to qualified immunity if he had either probable cause or 'arguable probable cause.'" Dufort v. City of New York, 874 F.3d 338, 354 (2d Cir. 2017) (citations omitted). "Arguable probable cause 'exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law.'" Soukaneh v. Andrzejewski, 112 F.4th 107, 122–23 (2d Cir. 2024) (citations omitted).

The parties are in agreement that Hughes spoke to the NYPD Legal Bureau at some point before arresting Rusfeldt. (Pl. 56.1 Resp. ¶ 105; Def. 56.1 ¶ 105.) Pointedly, the defendants do not state what he was told by the NYPD Legal Bureau. Rusfeldt disputes any implication that the NYPD Legal Bureau told Hughes that the arrest was lawful, because Hughes invoked the attorney-client privilege at his deposition, as is his right. (Pl. 56.1 Resp. ¶ 105; Def. 56.1 ¶ 105.)

Hughes may be entitled to qualified immunity in this action, but based upon the record established, there are questions of fact concerning the existence of probable cause and Hughes's role in the arrest. He has no valid claim—at least at this point—that he relied on legal advice that the arrest was lawful.

Hughes's claim of qualified immunity is denied without prejudice.

VII.    The Police Commissioner Will Be Dismissed From The Action In His Official Capacity.

Defendants also ask the Court to dismiss the Police Commissioner in his official capacity. (ECF 109 at 29.) Rusfeldt does not oppose this dismissal. (ECF 113 at 40 n.9.) The Court will therefore grant this request.

CONCLUSION

           Rusfeldt's motion and defendants' motion for summary judgment are DENIED without prejudice as to the facial and as applied challenges to N.Y. Penal Law § 240.20(6) & (7) (Fifth Claim). Rusfeldt's summary judgment motion is otherwise DENIED. Defendants' motion for summary judgment is GRANTED to the extent that it dismisses Rusfeldt's Free Exercise claim (Second Claim) and his Equal Protection claim (Fourth Claim). Defendant Hughes's motion for summary judgment on the basis of qualified immunity is denied without prejudice to renewal at trial. The Police Commissioner in his official capacity is DISMISSED on motion of defendants not opposed by Rusfeldt. Defendants' summary judgment motion is otherwise DENIED.

           Within in seven days, plaintiff shall file a proposed order to amend the caption.

           The Clerk of Court is respectfully requested to terminate the motions (ECF 98, 107).


           SO ORDERED.

                                        P. Kevin Castel
                                  United States District Judge

Dated:       New York, New York
              September 30, 2024